People v Mortel (2021 NY Slip Op 04498)





People v Mortel


2021 NY Slip Op 04498


Decided on July 21, 2021


Appellate Division, Second Department


Miller, J., J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on July 21, 2021
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Second Judicial Department

REINALDO E. RIVERA, J.P.
CHERYL E. CHAMBERS
ROBERT J. MILLER
FRANCESCA E. CONNOLLY
PAUL WOOTEN, JJ.


2017-01003
 (Ind. No. 15-00395)

[*1]The People of the State of New York, respondent,
v
Patricia Mortel, appellant.



APPEAL by the defendant from a judgment of the County Court (David S. Zuckerman, J.), rendered December 20, 2016, and entered in Rockland County, convicting her of criminal possession of a controlled substance in the first degree, upon a jury verdict, and imposing sentence. The appeal brings up for review the denial, after a hearing, of that branch of the defendant's omnibus motion which was to suppress physical evidence. Justice Connolly has been substituted for former Justice Balkin (see 22 NYCRR 1250.1[b]).



Del Atwell, East Hampton, NY, for appellant.
Thomas E. Walsh II, District Attorney, New City, NY (Carrie A. Ciganek and Amanda Doty of counsel), for respondent.



MILLER, J.


OPINION & ORDER
Law enforcement personnel assigned to this case intercepted approximately 89,000 communications in connection with their investigation. Through this and other evidence, they learned that a certain 2001 Ford Explorer would be transporting a quantity of narcotics through a certain location on a particular night. New York State Police Troopers assigned to this case were briefed at the beginning of their shift about the situation and directed to stop and search the vehicle if they encountered it. The State Troopers drove on a highway and waited for the vehicle to appear. Approximately six hours after their shift began, the State Troopers observed the subject vehicle on the highway. The vehicle was stopped by the State Troopers, the defendant and her codefendant were arrested, and a large quantity of cocaine was recovered from the vehicle.
Although the State Troopers were directed to stop and search the vehicle, they were not provided with a warrant. It is undisputed that none of the law enforcement personnel involved in this case ever sought or obtained a warrant in connection with the stop, the search, or the seizure of the subject evidence. The People later asserted a series of exceptions to the constitutional warrant requirements to justify the actions of law enforcement. The County Court accepted and adopted all of the People's inconsistent factual theories, and ultimately upheld the warrantless search. Based on the evidence recovered, the defendant was convicted of criminal possession of a controlled substance in the first degree and sentenced to eight years in prison and five years of postrelease supervision.
"The guarantee against unreasonable searches and seizures found in both the State and Federal Constitutions (US Const 4th Amend; NY Const, art I, § 12) is designed to protect the [*2]personal privacy and dignity of the individual against unwarranted intrusions by the State" (Matter of Patchogue-Medford Congress of Teachers v Board of Educ., 70 NY2d 57, 66; see People v Hodge, 44 NY2d 553, 557). To assure such protection, "save for few specifically established and well-defined exceptions, the determination of whether the desire of the police to conduct a search or seizure is supported by probable cause is entrusted in the first instance to a neutral Magistrate" (People v Hodge, 44 NY2d at 557; see People v P.J. Video, 68 NY2d 296, 306; People v Hanlon, 36 NY2d 549, 559).
It is a "fundamental precept 'that warrantless searches and seizures are per se unreasonable unless they fall within one of the acknowledged exceptions to the Fourth Amendment's warrant requirement'" (People v Sanders, 26 NY3d 773, 776 [emphasis added], quoting People v Diaz, 81 NY2d 106, 109; see People v Jimenez, 22 NY3d 717, 721; People v Hodge, 44 NY2d at 557). "'Where a warrant has not been obtained, it is the People who have the burden of overcoming th[e] presumption' of unreasonableness" (People v Sanders, 26 NY3d at 777, quoting People v Hodge, 44 NY2d at 557).
Here, the People failed to sustain their burden at the suppression hearing. As detailed more fully below, the People failed to adequately demonstrate the applicability of the proffered exceptions to the search warrant requirements of the State and Federal Constitutions. Accordingly, the County Court should have granted that branch of the defendant's omnibus motion which was to suppress the physical evidence recovered as a result of the police action in this case, and the judgment must be reversed.
I. Factual and Procedural Background
The defendant, Patricia Mortel, and her codefendant, Aaron Parker, were both charged by indictment with one count of criminal possession of a controlled substance in the first degree and one count of criminal possession of a controlled substance in the third degree. By omnibus motion, the defendant moved to suppress, among other things, physical evidence. Specifically, she sought to suppress a quantity of cocaine that had been recovered from a vehicle after it was stopped by law enforcement officials.
At a hearing pursuant to Mapp v Ohio (367 US 643), the People presented, inter alia, the testimony of two members of the New York State Police who were involved in the arrest of the defendant. At the conclusion of the hearing, the County Court, among other things, credited the testimony of the People's witnesses and concluded that the stop and the ensuing search of the vehicle were lawful under the State and Federal Constitutions. The court cited two alternative grounds to support its conclusion that the subject vehicle had been lawfully stopped. The court cited to three alternative grounds to support its conclusion that the cocaine had been lawfully recovered from the vehicle. Based upon these alternative grounds, the court denied that branch of the defendant's omnibus motion which was to suppress the cocaine that had been recovered from the subject vehicle.
The defendant subsequently stood trial. The jury convicted the defendant of criminal possession of a controlled substance in the first degree, but acquitted her of criminal possession of a controlled substance in the third degree. On December 20, 2016, the County Court imposed sentence.
II. The Appeal
On appeal, the defendant contends, inter alia, that the County Court should have granted that branch of her omnibus motion which was to suppress the physical evidence recovered from the vehicle. The defendant asserts that the People failed to sustain their burden at the suppression hearing since the evidence failed to establish either a valid reason for stopping the vehicle, or searching it. In response, the People contend that the court properly denied that branch of the defendant's omnibus motion based on each of the alternative grounds cited in its decision and order.
III. Analysis
A. The County Court's Determination
As indicated, the County Court cited two alternative grounds for its determination that the subject vehicle was lawfully stopped. The court first concluded that the State Troopers had probable cause to stop the vehicle by virtue of "the fellow-officer rule." In this regard, the court cited to testimony that law enforcement officials had intercepted approximately 89,000 communications, and that some of these communications indicated that there would be a quantity of narcotics in the vehicle on the night in question.
The County Court alternatively determined that the State Troopers were entitled to [*3]stop the vehicle because testimony at the hearing showed that the State Troopers had reasonable cause to believe that a traffic infraction had been committed. In this regard, the court credited the testimony of one of the State Troopers who testified that he observed the subject vehicle exceed the maximum speed limit and fail to maintain its lane.
The County Court asserted three alternative grounds to support its conclusion that the evidence was lawfully recovered from the vehicle after the stop was initiated. First, the court concluded that the intercepted communications and the application of the fellow officer rule provided a lawful basis for the search of the vehicle at the outset of the traffic stop.
The County Court alternatively concluded that the State Troopers were authorized to search the subject vehicle under the "automobile exception" to the Fourth Amendment. In this regard, the court noted that one of the State Troopers had reportedly detected the odor of marihuana when he initially approached the vehicle after it was pulled over.
Finally, the County Court determined, as a third alternative ground, that the cocaine was properly recovered pursuant to a valid inventory search. In this regard, the court stated that one of the State Troopers ran the registration of the vehicle and learned that it had been suspended due to lapsed insurance. Accordingly, the court alternatively concluded that the cocaine was recovered in connection with a valid inventory search.
B. The Stop of the Vehicle
The defendant contends that the County Court erred insofar as it determined that the State Troopers were authorized to stop the vehicle. As indicated, the court cited two alternative grounds for this determination: (1) the stop of the vehicle was properly based on information received by the State Troopers from other law enforcement officials which indicated that the vehicle contained narcotics, and (2) the stop of the vehicle was properly based on a series of traffic infractions that one of the State Troopers witnessed while they followed the vehicle.
1. Fellow Officer Rule
On appeal, the People maintain that "[t]he evidence adduced at the suppression hearing established that New York State Police Troopers Caban and Tierney had probable cause to stop . . . the vehicle . . . based upon information given to them by investigators with the Rockland County Drug Task Force that defendant's vehicle contained cocaine." The People further argue that "[t]he information provided to the Troopers by fellow law enforcement officers gave the Troopers probable cause to stop . . . the vehicle pursuant to the automobile warrant exception" to the Fourth Amendment.
"The touchstone of the Fourth Amendment right against unreasonable searches and seizures is reasonableness" (People v Gittens, 211 AD2d 242, 244; see People v Cantor, 36 NY2d 106; People v Moore, 32 NY2d 67). The court must consider "whether or not the action of the police was justified at its inception and whether or not it was reasonably related in scope to the circumstances which rendered its initiation permissible" (People v Cantor, 36 NY2d at 111; People v De Bour, 40 NY2d 210, 223). "In applying this standard, the courts have created what is sometimes referred to as the 'fellow officer' rule" (People v Gittens, 211 AD2d at 244).
The fellow officer rule is a "straightforward application" of the two-pronged Aguilar-Spinelli test (see Spinelli v United States, 393 US 410; Aguilar v Texas, 378 US 108), "which New York courts use to assess whether hearsay information is sufficient to establish probable cause for a warrantless arrest or the issuance of a warrant" (People v Oglesby, 121 AD3d 818, 819; see People v Parris, 83 NY2d 342, 346; People v Dodt, 61 NY2d 408, 415). "The Aguilar-Spinelli test first requires the suppression court to assess whether the information on which the police have acted is reliable" (People v Oglesby, 121 AD3d at 819; see Aguilar v Texas, 378 US at 114; People v Ketcham, 93 NY2d 416, 423; People v Bigelow, 66 NY2d 417, 423). "The second part of the Aguilar-Spinelli test evaluates whether the informant had an adequate 'basis of knowledge' for the information supplied" (People v Oglesby, 121 AD3d at 819, quoting People v Parris, 83 NY2d at 346-347; see People v Bigelow, 66 NY2d at 423).
Under the fellow officer rule, "[i]nformation received from another police officer is presumptively reliable" (People v Ketcham, 93 NY2d at 420). The "rule is based on both the presumption of veracity and accuracy afforded a communication from one police officer to another and the recognition that modern law enforcement often involves the work of a variety of officers" (People v Gittens, 211 AD2d at 245). "The People still, however, must satisfy the second prong of the Aguilar-Spinelli test: how the transmitting officer acquired that information" (People v Oglesby, 121 AD3d at 819-820). In this regard, the People must demonstrate that "the information imparted [*4]was 'obtained in a reliable way' (Spinelli v United States, 393 US at 417)—that it constitutes more than unsubstantiated rumor, unfounded accusation or conclusory characterization" (People v Ketcham, 93 NY2d at 420). "An unsubstantiated hearsay communication—even when transmitted by a fellow officer—will not satisfy the People's burden" (id.).
"The arresting officer acts with probable cause when he [or she] arrests [an individual] on the basis of information received from a fellow officer who testifies at the suppression hearing concerning how he [or she] obtained his [or her] knowledge, which information itself or together with that [personally] known to the arresting officer establishes probable cause" (People v Brnja, 50 NY2d 366, 373 n 4; see People v Petralia, 62 NY2d 47; People v Dorta, 244 AD2d 566; People v Gittens, 211 AD2d at 244). "Probable cause exists when an officer has knowledge of facts and circumstances sufficient to support a reasonable belief that an offense has been or is being committed" (People v Maldonado, 86 NY2d 631, 635 [internal quotation marks omitted]). At a suppression hearing, "the prosecution bears the burden of establishing that the officer imparting the information had probable cause to act" (People v Ketcham, 93 NY2d at 420; see People v Oglesby, 121 AD3d at 819). The People must establish that the imparting officer "had an adequate basis of knowledge for the information transmitted, either from direct participation in the transaction or observation of it" (People v Oglesby, 121 AD3d at 820; see People v Ketcham, 93 NY2d at 420; People v Brnja, 50 NY2d at 373 n 4).
Here, at the suppression hearing the People presented, inter alia, the testimony of two members of the New York State Police who were involved in the motor vehicle stop: (1) Trooper John Caban and (2) Trooper Brian Hunter.
Trooper Caban testified that his partner, identified at the hearing as "Trooper Tierney," received a call from an unidentified member of the Rockland County Drug Task Force advising him to conduct a stop of a 2001 black Ford Explorer because it contained narcotics. Trooper Caban did not overhear the phone call between Trooper Tierney and the unidentified individual.
Trooper Hunter similarly testified that he did not speak with the unidentified individual who spoke with Trooper Tierney. Trooper Hunter learned from Trooper Tierney that a 2001 black Ford Explorer might be transporting drugs that night. Trooper Hunter received this information at the beginning of his shift at approximately 7:00 p.m. The subject vehicle was actually stopped approximately six hours later.
There was no testimony as to which officer with the Rockland County Drug Task Force transmitted the information to Trooper Tierney about the suspected narcotics in the vehicle or the basis of that officer's knowledge. Trooper Tierney himself did not testify. The People failed to provide any information at the hearing as to how the unidentified member of the Rockland County Drug Task Force learned that there were narcotics in the subject vehicle (cf. People v Thomas, 137 AD3d 698, 699; People v Green, 100 AD3d 654, 655; People v McNair, 85 AD3d 693; People v Glasgow, 12 AD3d 1172). Although there were references to eavesdropping warrants that had been obtained for the defendant's and her codefendant's phones, the People inexplicably failed to offer any evidence at the hearing to establish that the unidentified individual who advised the State Troopers to stop the vehicle had an adequate basis of knowledge to conclude that it contained narcotics (see People v Brnja, 50 NY2d at 373 n 4; People v Searight, 162 AD3d 1633, 1635; cf. People v Rosario, 78 NY2d 583, 589; People v Scott, 237 AD2d 543, 543). Accordingly, on this record, the County Court erred as a matter of law to the extent that it relied upon the fellow officer rule to justify the stop of the vehicle.
2. Vehicle and Traffic Law Violations
As indicated, the People alternatively contend that the warrantless stop was justified based on testimony that the driver of the subject vehicle committed a series of traffic infractions while the vehicle was being followed by the State Troopers.
"A forcible stop of the occupants in a vehicle is equally intrusive whether done to enforce the laws against traffic infractions or the laws against crimes" (People v Hinshaw, 35 NY3d 427, 432). "[T]o curb potential discriminatory practices, New York . . . provides greater protections than does federal law for traffic infraction vehicle stops" (id. at 432; see People v Robinson, 97 NY2d 341, 353).
"Under the settled law of New York, an automobile stop 'is a seizure implicating constitutional limitations'" (People v Hinshaw, 35 NY3d at 430, quoting People v Spencer, 84 NY2d 749, 752). "Automobile stops are lawful only [1] when 'based on probable cause that a driver has [*5]committed a traffic violation' (People v Robinson, 97 NY2d [at] 349-350); [2] when based on a reasonable suspicion that the driver or occupants of the vehicle have committed, are committing, or are about to commit a crime (People v Spencer, 84 NY2d at 752-753); or, [3] 'when conducted pursuant to "nonarbitrary, nondiscriminatory, uniform" highway traffic procedures'" (People v Hinshaw, 35 NY3d at 430, quoting People v Sobotker, 43 NY2d 559, 563).
Here, Trooper Caban testified that the State Troopers had been specifically directed to stop the 2001 black Ford Explorer, and so once they observed it on the highway, they followed it in their vehicle for approximately one mile. Although Trooper Caban's vehicle was equipped with a radar device, he did not utilize it to assess the vehicle's speed. Instead, Trooper Caban testified that he visually determined, over the course of the mile, that the subject vehicle was traveling 65 miles per hour in a 55-mile-per-hour zone. Trooper Caban also testified that the vehicle "struck the hazard marking lanes two times" while he was following it.
The defendant contends that the alleged traffic infractions served merely as a pretext, in that the State Troopers' real motivation for stopping the vehicle was to investigate the presence of drugs in the vehicle. The defendant contends that traffic tickets were never issued for speeding or failing to maintain a lane. In addition, the defendant points to the evidence at the hearing which demonstrated that the State Troopers had already been directed to stop and search the vehicle before it even appeared on the roadway.
The Court of Appeals has held that "where a police officer has probable cause to believe that the driver of an automobile has committed a traffic violation, a stop does not violate article I, § 12 of the New York State Constitution" (People v Robinson, 97 NY2d at 349). "In making that determination of probable cause, neither the primary motivation of the officer nor a determination of what a reasonable traffic officer would have done under the circumstances is relevant" (id.; see People v Sluszka, 15 AD3d 421, 423).
Accordingly, although the record supports the defendant's contention that the State Troopers would not have pulled the vehicle over had they not been instructed to search it for the presence of contraband, this fact alone is not dispositive (see People v Robinson, 97 NY2d at 349; People v Sluszka, 15 AD3d at 423). The stop of the vehicle was constitutional so long as the State Troopers had probable cause to believe that a traffic infraction had been committed.
The defendant contends that the State Troopers did not have probable cause to believe that a traffic infraction had been committed. The defendant contends that the State Troopers contrived the traffic infractions as a pretext to stop the vehicle, and that "[n]o traffic infraction was issued because no traffic infraction [actually] occurred." The defendant, in effect, asks this Court to reject Trooper Caban's testimony that he observed numerous traffic violations while following the subject vehicle over a one-mile distance on the highway (see generally People v Berrios, 28 NY2d 361, 369). Although the State Troopers, directed to stop the vehicle without a warrant, undoubtably had a strong motivation to witness a traffic violation, we decline, in the exercise of our power of factual review in this case (see CPL 470.15; Matter of Robert D., 69 AD3d 714, 717), to disturb the County Court's determination to credit Trooper Caban's sworn testimony that he personally observed the traffic violations described above (cf. People v Harris, 192 AD3d 151, 164-165). We note that, contrary to the defendant's contention, Trooper Caban issued traffic tickets for operating a vehicle while registration was suspended/revoked, speeding, operating without insurance, and failing to keep right, which tickets were admitted into evidence at the hearing.
Based on our deference to this credibility determination (see People v Foster, 153 AD3d 853, 853), we conclude that the People established that the State Troopers had probable cause to believe that a traffic violation had been committed, and the stop of the vehicle was therefore lawful under the State and Federal Constitutions, even though it was primarily motivated by a desire to investigate the suspected presence of controlled substances (see People v Hinshaw, 35 NY3d at 430; People v Wright, 98 NY2d 657, 658-659; People v Robinson, 97 NY2d at 349-350; People v Spencer, 84 NY2d at 752-753). Of course, notwithstanding this determination, "[t]he scope, duration and intensity of the seizure, as well as any search made by the police subsequent to that stop, remain[ed] subject to the strictures of article I, § 12 [of the New York State Constitution], and judicial review" (People v Robinson, 97 NY2d at 353).
C. The Search of the Vehicle
After concluding that the vehicle was lawfully stopped, the County Court determined that it was also lawfully searched and the cocaine lawfully seized. The court offered three alternative grounds to support its conclusion that the evidence was lawfully recovered from the vehicle after the [*6]stop was initiated: (1) the intercepted communications provided a lawful basis to search for narcotics at the outset of the traffic stop; (2) the search was lawful under the automobile exception to the warrant requirement because one of the State Troopers detected the odor of marihuana from the vehicle; and (3) the cocaine was properly recovered pursuant to a valid "inventory search" of the vehicle.
1. Fellow Officer Rule
On appeal, the People maintain that "[t]he evidence adduced at the suppression hearing established that New York State Police Troopers Caban and Tierney had probable cause to . . . search the vehicle . . . based upon information given to them by investigators with the Rockland County Drug Task Force that defendant's vehicle contained cocaine." The People further argue that "[t]he information provided to the Troopers by fellow law enforcement officers gave the Troopers probable cause to . . . search the vehicle pursuant to the automobile warrant exception."
Contrary to the People's contention, the evidence adduced at the suppression hearing was insufficient to establish that the State Troopers properly searched the vehicle based on the fellow officer rule. As we have already noted, the People failed to offer evidence to establish the identity of the individual who advised the State Troopers to stop the vehicle, or that he or she had an adequate basis of knowledge to conclude that it contained narcotics.
2. Odor of Marihuana
The People further contend that the State Troopers "had probable cause to search the vehicle defendant was operating without a warrant based on a trooper detecting the odor of marihuana emanating from the vehicle." The People maintain that "[w]hen troopers approached the vehicle, Trooper Tierney detected the odor of marihuana." The People conclude that "[t]he troopers had probable cause to believe that the vehicle contained contraband and therefore under the automobile exception to search warrant requirement, the search of the vehicle was lawful."
As already noted, Trooper Tierney did not testify at the hearing. Trooper Caban affirmatively testified that he did not smell the odor of marihuana at the scene of the traffic stop. Trooper Hunter testified that he could not recall if he smelled anything unusual. Neither of the testifying State Troopers who was present at the search claimed to have acted on the basis of the alleged odor of marihuana (see People v Brnja, 50 NY2d at 373 n 4). The testimony established that, although the vehicle was nevertheless searched, no marihuana was ever recovered from the vehicle because "[t]here was none."
In sum, the record does not support the County Court's determination that "upon detecting the odor of marihuana emanating from the vehicle, Trooper Caban was authorized to conduct a search of same." Since the People failed to sustain their factual assertion in the first instance, there is no occasion to consider whether those alleged facts would satisfy one of the exceptions to the search warrant requirements of the State and Federal Constitutions advanced by the People in this case (cf. People v Harris, 163 AD3d 993, 994; People v Singletary, 156 AD3d 731, 731).
3. Inventory Search
Finally, the People contend that in addition to being a lawful search for narcotics or a valid search for marihuana, "[t]he search of the vehicle was also a lawful inventory search." This third alternative ground, asserted to justify the warrantless search in this case, is also without merit.
a. Fourth Amendment Jurisprudence
The Fourth Amendment of the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized" (US Const Amend IV).
"[A]utomobiles are 'effects' and thus within the reach of the Fourth Amendment" (South Dakota v Opperman, 428 US 364, 367). As the text of the Amendment suggests, "[t]he Fourth Amendment does not require that every search be made pursuant to a warrant. It prohibits only unreasonable searches and seizures" (id. at 372-373 [internal quotation marks omitted]; see Coolidge v New Hampshire, 403 US 443, 509-510).
In construing the effect of this Amendment, the United States Supreme Court has stated: "'Over and again this Court has emphasized that the mandate of the [Fourth] Amendment requires adherence to judicial processes,' . . . and that searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth [*7]Amendment—subject only to a few specifically established and well-delineated exceptions" (Katz v United States, 389 US 347, 357 [footnote and citation omitted]; see Arizona v Gant, 556 US 332, 338).
Although it is often said that "inventory searches are now a well-defined exception to the warrant requirement of the Fourth Amendment" (Colorado v Bertine, 479 US 367, 371), their status as an exception to the warrant requirement is relatively new. Indeed, the United States Supreme Court did not explicitly recognize the inventory search exception until 1976 (see South Dakota v Opperman, 428 US at 377 [Powell, J., concurring] ["[n]one of our prior decisions is dispositive of the issue whether the [Fourth] Amendment permits routine inventory 'searches' of automobiles" (footnote omitted)]).
In that case, South Dakota v Opperman (428 US 364), the defendant's illegally parked car was towed to a city impound lot where "a police officer observed a watch on the dashboard and other items of personal property located on the back seat and back floorboard" (id. at 366). "At the officer's direction, the car door was then unlocked and, using a standard inventory form pursuant to standard police procedures, the officer inventoried the contents of the car, including the contents of the glove compartment, which was unlocked" (id.). "There he found marihuana contained in a plastic bag" (id.). "All items, including the contraband, were removed to the police department for safekeeping" (id.).
Chief Justice Burger, in his majority opinion, upheld the search as constitutional (see id. at 376). He stated that the police were engaged in "a caretaking search of a lawfully impounded automobile" and that "[t]he inventory itself was prompted by the presence in plain view of a number of valuables inside the car" (id. at 375-376).
The majority of the United States Supreme Court held: "On this record we conclude that in following standard police procedures . . . the conduct of the police was not 'unreasonable' under the Fourth Amendment" (id. at 376). In doing so, the Court emphasized that "there is no suggestion whatever that this standard procedure . . . was a pretext concealing an investigatory police motive" (id.).
Justice Powell, in a concurring opinion, provided a more comprehensive explanation for the United States Supreme Court's constitutional analysis (see id. at 376-384). He noted that "[i]n the criminal context the requirement of a warrant protects the individual's legitimate expectation of privacy against the overzealous police officer" (id. at 383), but that, in the context of an inventory search, "none of these [issues are] implicated" (id.).
Justice Powell explained: "Inventory searches . . . are not conducted in order to discover evidence of crime" (id.). "The officer does not make a discretionary determination to search based on a judgment that certain conditions are present" (id.). Rather, "[i]nventory searches are conducted in accordance with established police department rules or policy and occur whenever an automobile is seized" (id.). "There are thus no special facts for a neutral magistrate to evaluate" (id.).
In this regard, vehicle inventories may be compared to other types of inspections or regulatory searches where probable cause is not required (see 3 Wayne R. LaFave, Search and Seizure § 7.4[a] [6th ed Sept. 2020 Update]). Those types of searches, like vehicle inventories, require a regular procedure which adequately protects against arbitrariness (see id.; accord Illinois v Lafayette, 462 US 640, 648).
The United States Supreme Court next addressed this issue approximately 10 years later in Colorado v Bertine (479 US 367). In that case, the defendant "was taken into custody [by the police] and before the arrival of a tow truck to take [the defendant's] van to an impoundment lot, a backup officer inventoried the contents of the van" (id. at 368-369 [footnote omitted]). "The officer opened a closed backpack in which he found controlled substances, cocaine paraphernalia, and a large amount of cash" (id. at 369).
The United States Supreme Court held that the search did not violate the Fourth Amendment (see id.). Chief Justice Rehnquist's opinion noted that "[t]he backup officer inventoried the van in accordance with local police procedures, which require a detailed inspection and inventory of impounded vehicles" (id.). These standard local procedures "mandated a 'detailed inventory involving the opening of containers and the listing of [their] contents'" (id. at 370). The Chief Justice stressed at multiple points in his opinion that there was "no showing" (id. at 372) that the police had acted "to investigate suspected criminal activity" (id. at 376).
In a concurring opinion, Justice Blackmun, joined by two other Justices, reiterated [*8]that "[t]he underlying rationale for allowing an inventory exception to the Fourth Amendment warrant rule is that police officers are not vested with discretion to determine the scope of the inventory search" (id. at 376). "This absence of discretion ensures that inventory searches will not be used as a purposeful and general means of discovering evidence of crime" (id.). "Thus, it is permissible for police officers to open closed containers in an inventory search only if they are following standard police procedures that mandate the opening of such containers in every impounded vehicle" (id. at 376-377). "As the Court emphasizes, the trial court in this case found that the Police Department's standard procedures did mandate the opening of closed containers and the listing of their contents" (id. at 377).
In sum, the United States Supreme Court in Bertine established that a lawful inventory of the contents of closed containers may occur when the overall inventory was performed in accordance with a policy that permitted no discretion whatsoever to the officers who conducted it (see id. at 370, 376-377; see generally 3 Wayne R. LaFave, Search and Seizure § 7.4[a]).
Finally, in Florida v Wells (495 US 1),[FN1] the defendant was arrested by a Florida Highway Patrol trooper for driving under the influence of alcohol and the defendant's car was impounded (see id. at 2). "At the impoundment facility, an inventory search of the car turned up two marijuana cigarette butts in an ashtray and a locked suitcase in the trunk" (id.). "Under the trooper's direction, employees of the facility forced open the suitcase and discovered a garbage bag containing a considerable amount of marijuana" (id.).
Chief Justice Rehnquist, again writing for the United States Supreme Court, stated, "Our view that standardized criteria . . . or established routine . . . must regulate the opening of containers found during inventory searches is based on the principle that an inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence" (id. at 4). "The policy or practice governing inventory searches should be designed to produce an inventory" (id.), and "[t]he individual police officer must not be allowed so much latitude that inventory searches are turned into 'a purposeful and general means of discovering evidence of crime'" (id., quoting Colorado v Bertine, 479 US at 376).
The United States Supreme Court noted that "the Supreme Court of Florida found that the Florida Highway Patrol had no policy whatever with respect to the opening of closed containers encountered during an inventory search" (Florida v Wells, 495 US at 4-5). The Court continued: "We hold that absent such a policy, the instant search was not sufficiently regulated to satisfy the Fourth Amendment and that the marijuana which was found in the suitcase, therefore, was properly suppressed by the Supreme Court of Florida" (id. at 5).
b. New York State Case Law
The Court of Appeals has instructed that "[a]n inventory search is exactly what its name suggests, a search designed to properly catalogue the contents of the item searched" (People v Johnson, 1 NY3d 252, 256). Three specific objectives are advanced by any inventory search: "[1] protecting an owner's property while it is in the custody of the police; [2] insuring police against claims of lost, stolen, or vandalized property; and [3] guarding police and others from dangerous instrumentalities that would otherwise go undetected" (People v Galak, 80 NY2d 715, 718).
"The People bear the burden of demonstrating the validity of [an] inventory search" (People v Padilla, 21 NY3d 268, 272). The People bear the threshold burden of demonstrating that the subject vehicle was lawfully impounded at the time of the inventory search (see generally 1 Barry Kamins, New York Search & Seizure § 5.05[6][a]). The prosecution also has the burden of submitting evidence to establish that the inventory search was conducted pursuant to standardized local police procedures (see People v Padilla, 21 NY3d at 272; see generally 1 Barry Kamins, New York Search & Seizure § 5.05[6][b]).
Finally, the Court of Appeals has held that an inventory search will be constitutionally invalid where the search was merely a pretext to search for evidence of a crime (see People v Johnson, 1 NY3d at 257; see also People v Lewis, 217 AD2d 591, 592-593).
c. The Defendant's Arguments
On appeal, the defendant argues that the People bore the burden of demonstrating that the inventory search was valid. The defendant contends that in order to meet that burden, the People were required to demonstrate the existence of a standardized inventory procedure and that the procedure was actually followed in this case. The defendant argues that "the procedure must be standardized so as to 'limit the discretion of the officer in the field'" and that an inventory search is invalid if it was used as a pretext to discover incriminating evidence.
The defendant further argues that, in this case, "the record is woefully inadequate to comply with the requirements of an inventory search." The defendant contends, among other things, that Trooper Tierney, the individual "who . . . discovered the cocaine, did not testify." The defendant continues: "Considering that [Trooper Tierney] was the only witness with direct knowledge of the events that precipitated the search and seizure, his testimony was necessary."
d. Application of Law
"The People bear the burden of demonstrating the validity of [an] inventory search" (People v Padilla, 21 NY3d at 272). When an inventory search of an automobile is challenged under the State and Federal Constitutions, New York case law requires the People to establish, inter alia, (1) that the vehicle was lawfully impounded, (2) that the search was conducted pursuant to a standardized local police procedure that limits the discretion of the officers in the field, and (3) that the inventory was not conducted as a pretext to search for evidence.
i. Lawfully Impounded
Only a lawfully impounded vehicle may be subjected to an inventory search (see People v Tardi, 28 NY3d 1077, 1078-1079; People v Walker, 20 NY3d 122, 125-126). Accordingly, in reviewing the constitutionality of an inventory search, the threshold issue is whether the vehicle was lawfully impounded (see generally 1 Barry Kamins, New York Search & Seizure § 5.05[6][a]).
Here, the County Court, in its decision and order, determined that "at the time of the traffic stop, Trooper Caban ran the registration for the black Ford Explorer and learned that it had been suspended due to lapsed insurance." The court continued: "Relying on that information, the Troopers impounded the vehicle and conducted a wholly permissible inventory search."
Case law from this Court indicates that where law enforcement officers determine that a vehicle's registration has been suspended, this suspension furnishes a valid basis to impound the vehicle (see People v Shepley, 185 AD2d 862, 863 [inventory search upheld where "[t]he inventory search was conducted after the police officer learned that the defendant's registration had expired approximately two months before and thus determined that the defendant's van was to be impounded"]; see also People v Johnson, 254 AD2d 500, 501 [State Troopers properly impounded vehicle where "[u]pon stopping the vehicle, it was discovered that none of the three occupants of the vehicle had a valid driver's license"]).
However, the record does not support the County Court's factual finding that "Trooper Caban ran the registration for the black Ford Explorer and learned that it had been suspended due to lapsed insurance."
On direct examination, Trooper Caban responded, "Yes" when he was asked, "Did there come a point in time when you ran the license and registration to this vehicle?" However, when he was asked on cross-examination by the codefendant's attorney where the codefendant was standing when he ran the license and registration, Trooper Caban replied, "I did not run the registration." When he was asked who ran the registration, he answered, "I'm not sure." During cross-examination by the defendant's attorney, Trooper Caban repeatedly stated that he did not run the registration and that he had no personal knowledge as to that issue.
Trooper Hunter testified that he "believe[d]" that Trooper Tierney informed him of the suspended registration during an unrecorded call on his personal cell phone that occurred sometime before he arrived at the scene. When asked, "Did [Trooper Tierney] tell you how he knew that information?" Trooper Hunter answered, "No, he didn't."
As was argued by the defense at the close of the suppression hearing, the People failed to establish a valid basis for impounding the vehicle. Our dissenting colleagues, in considering the merits of this issue, cite to the testimony of Investigator Philip Fantasia who testified at the hearing about his review of certain Department of Motor Vehicles records. However, the People failed to demonstrate that the State Troopers who stopped and searched the vehicle were actually acting on information they had received from Investigator Fantasia. Indeed, the People failed to establish the identity of the individual who advised the State Troopers that the registration was suspended, or the basis of that individual's information. Again, neither of the two State [*9]Troopers who testified at the suppression hearing had personal knowledge that the registration had been suspended, and the evidence was otherwise insufficient to support the application of the fellow officer rule since "[a]n unsubstantiated hearsay communication—even when transmitted by a fellow officer—will not satisfy the People's burden" (People v Ketcham, 93 NY2d at 420).
Although this is a preserved and dispositive issue, it was not raised by the attorney assigned by this Court to prosecute the defendant's appeal (cf. People v Turner, 5 NY3d 476, 481). Accordingly, under the circumstances, in reaching our determination herein we decline to review the County Court's conclusion that the People demonstrated that the State Troopers had a valid basis to impound the subject vehicle.
ii. Standardized Procedure
As indicated, the second criterion that is necessary to establish a constitutionally valid inventory search imposes upon the prosecution the burden of submitting evidence to establish that the inventory search was conducted pursuant to standardized local police procedures (see People v Padilla, 21 NY3d at 272; see generally 1 Barry Kamins, New York Search & Seizure § 5.05[6][b]).
Although a warrant based on probable cause is not required to conduct an inventory search, "courts have insisted that an inventory search be conducted according to a familiar routine procedure and that the procedure meet two standards of reasonableness" (People v Galak, 80 NY2d at 719 [citation omitted]). "First, the procedure must be rationally designed to meet the objectives that justify the search in the first place" (id.; see Florida v Wells, 495 US at 4). "Second, the procedure must limit the discretion of the officer in the field" (People v Galak, 80 NY2d at 719). As the Court of Appeals has recognized: "In the absence of a warrant from a neutral and detached Magistrate, it is an established procedure clearly limiting the conduct of individual officers that assures that the searches are carried out consistently and reasonably and do not become little more than an excuse for general rummaging to discover incriminating evidence" (id.).
The Court of Appeals has indicated that the People need not admit a written policy into evidence to establish the existence of a standardized local police procedure (see People v Walker, 20 NY3d at 126-127). Moreover, the Court has stated that "courts may take judicial notice of the standardized search procedure" (People v Gomez, 13 NY3d 6, 11; see People v Taylor, 92 AD3d 961, 962-963). However, "[w]hile [a written] procedure need not be offered into evidence, a description of what the procedure requires must be proffered" (People v Gomez, 13 NY3d at 11; see 1 Barry Kamins, New York Search & Seizure § 5.05[6][b]).
The prosecution's burden of demonstrating that an inventory search was conducted pursuant to a standardized police procedure is a two-fold requirement in that the People must establish: (1) the applicable standardized police procedure that existed at the time of the inventory search (see People v Johnson, 1 NY3d at 256; People v Jeffrey, 18 AD3d 776, 777); and (2) that the procedure was actually followed by the law enforcement official who conducted the inventory search (see People v Gomez, 13 NY3d at 11; People v Johnson, 1 NY3d at 256). Accordingly, even where the People demonstrate that a constitutionally adequate inventory procedure existed, an inventory search will not be upheld in the absence of evidence demonstrating "that th[e] particular officer conducted th[e] search properly and in compliance with established procedures" (People v Johnson, 1 NY3d at 256; see People v Gomez, 13 NY3d at 11).
Here, Trooper Caban testified that Trooper Tierney and Trooper Hunter conducted the inventory search. Trooper Caban sat with the codefendant in the back of a vehicle while the search was being conducted.
Trooper Caban testified that the State Troopers conducting the inventory search "discovered a black bag" and that there was a "big brick" of cocaine inside the black bag. Trooper Caban first saw the black bag when the other Troopers showed it to him. He did not see the black bag in the vehicle that was searched. He could not say how long the search took and agreed that he had not personally made any observations as to "how and when" the black bag was recovered. When asked if there was "any other property" found in the vehicle during the inventory search, Trooper Caban said, "I don't recall."
Trooper Hunter, after testifying generally about the standardized procedure used by the State Police, was asked, "What did you do in your search of the vehicle?" He replied, "I started to check the driver's side of the vehicle, the area—the seats, under the seats." Trooper Hunter indicated that Trooper Tierney was searching the passenger side of the vehicle at the same time that he was searching the driver's side.
Trooper Hunter was next asked, "And what, if anything, was recovered or found at [that] time?" He answered, "Trooper Tierney got my attention and showed me a black plastic bag that was in a pocketbook and in it you can see in plain view a large size brick, shape, which at the time I deemed was cocaine."
At this point, the defendant and the codefendant were placed under arrest. Trooper Hunter secured the cocaine in the trunk of the patrol vehicle and transported it to the State Police barracks in Haverstraw.
When he was asked, on direct examination, where the pocketbook was located, Trooper Hunter responded by saying, "If I recall, I believe it was in the back seat passenger side." On cross-examination by the codefendant's attorney, however, he stated that he first saw the pocketbook when Trooper Tierney showed it to him. When asked to describe what Trooper Tierney showed him, Trooper Hunter stated, "He showed me a black plastic bag, tilted it towards me and you could see the cocaine." Upon further questioning, Trooper Hunter clarified that the black plastic bag was inside the pocketbook when Trooper Tierney showed it to him.
On cross-examination by the defendant's attorney, Trooper Hunter was again asked to describe how the pocketbook was found:
"Q And when you were doing the inventory search, did you, yourself, see a black pocketbook in the back seat?
"A That, I don't recall.
"Q So as you sit here today, you don't know where that black pocketbook was in that vehicle, correct?
"A I don't recall.
"Q Well, were you made aware of where that black pocketbook was in that vehicle?
"A Made aware where. Trooper Tierney showed me. I don't know if I saw it prior. I can't testify to something I don't remember.
"Q Well, do you recall the condition of that pocketbook when— when Trooper Tierney—well, when Trooper Tierney showed it to you, the pocketbook was open, correct?
"A Correct.
"Q You don't know whether or not that pocketbook was closed or open at the time that Trooper Tierney took possession of it, can we agree?
"A Correct."
When he was later asked whether he made "any observations of what area Trooper Tierney was searching," Trooper Hunter responded, "Just the passenger side." When he was asked how long it took Trooper Tierney to locate the contraband, Trooper Hunter stated that "[i]t was relatively quick" because he "was only on the driver's side not that long."
Trooper Hunter did not testify that he inventoried any items in the vehicle. Other than to identify the side of the vehicle that Trooper Tierney searched, there is no description of the procedure that Trooper Tierney undertook in conducting the inventory search. There is no testimony that Trooper Tierney went through "everything that's in the actual vehicle," as per Trooper Hunter's description of the general State Police inventory procedure. There is no testimony that anything in the vehicle was actually inventoried.
The only evidence indicating that any inventory occurred at all came from the "Vehicle Impound and Inventory Record" which was admitted into evidence by the defendant's attorney without objection. The inventory form contains a description of the "[v]aluables" found in the interior of the car: "IN GLOVE BOX IT CONTAINED NUMEROUS PAPERS, LUGNUTS, [*10]BOLTS AND IN THE CENTER CONSOLE HAD PAPERS AND BUNCH OF CD'S. BACK SEAT HAD BAG OF MISC FRUIT, BAG WITH GATORADE IN IT. PURSE."
The entries on the inventory form are typewritten and the form notes that the vehicle was towed by a private company to the State Police barracks in Haverstraw where it was kept in a locked condition. Accordingly, the inventory form that was admitted into evidence could not have been completed on the side of the highway at the time the cocaine was located and seized.
The form itself indicates that Trooper Tierney prepared it. Although the form was admitted into evidence, Trooper Tierney did not testify and the People did not establish whether he went through "everything that's in the actual vehicle," as per Trooper Hunter's description of the general State Police inventory policy. The inventory list only included descriptions of "[v]aluables." It did not indicate that it included "everything" in the vehicle, or that "everything" in the vehicle had actually been reviewed by the officer that completed the form.
The gaps in the record result from the fact that the individual that completed the actual inventory of the miscellaneous items in the vehicle did not testify. Although Trooper Hunter testified about taking part in the search, he did not testify that he inventoried any item. There is no indication on the inventory form that Trooper Hunter inventoried any of the items listed on that form. When he was asked about an entry on the inventory form during cross-examination, he responded, "Again, this is a Vehicle Impound and Inventory Record that was done by Trooper Tierney, not myself, so I can't testify."
As the defendant correctly contends, the People failed to offer the testimony from the State Trooper who actually conducted the inventory search and recovered the cocaine. Although Trooper Hunter testified in general about the State Police inventory search procedure, and the general procedure he personally used when conducting an inventory search, there is no evidence that Trooper Tierney was aware of the State Police inventory procedure, or that Trooper Tierney actually followed that procedure in the course of this search. Trooper Hunter plainly testified that he did not locate the evidence in question and he did not see the evidence before it was moved by Trooper Tierney. He further testified that he did not inventory any item in the vehicle, and he did not take any part in the preparation of the inventory list that was later produced. The People failed to otherwise establish how the actual inventory was conducted, the exact location of the evidence in question, and the condition of the evidence when it was discovered, in situ.
As the defendant correctly argues, the evidence at the hearing was insufficient to establish that Trooper Tierney actually conducted the inventory search pursuant to a police procedure which was rationally designed to meet the objectives justifying such a search and effectively limited his discretion so as to assure that he was not merely rummaging for incriminating evidence. On this record, "the People failed to produce evidence demonstrating . . . that this particular officer conducted this search properly and in compliance with established procedures" (People v Russell, 13 AD3d 655, 657; see People v Gomez, 13 NY3d at 11 ["[a]lthough the NYPD has a standardized, written protocol governing inventory searches in its Patrol Guide and the arresting officer testified that he was familiar with it, the People offered no evidence that the police officers conducted this search in accordance with the protocol"]; People v Johnson, 1 NY3d at 256 [inventory search unlawful where "the People failed to produce evidence demonstrating . . . that this particular officer conducted this search properly and in compliance with [the] established procedures" (citation omitted)]; People v Espinoza, 174 AD3d 1062, 1063 [inventory search unlawful where "[t]he deputy sheriff only vaguely stated that he conducted the inventory search" and "[t]he People . . . failed to ask any substantive questions of the deputy sheriff to establish that the policy was sufficiently standardized . . . and that the deputy sheriff followed it"]; People v Bacquie, 154 AD3d 648, 650 [inventory search unlawful where "no testimony was given at the suppression hearing about . . . the officer's compliance with [the alleged standardized policy]"]; People v Leonard, 119 AD3d 1237, 1238 [inventory search unlawful where "the People . . . failed to ask any substantive questions of their witnesses so as to . . . establish . . . that [the alleged inventory policy] was followed here"]; cf. People v Padilla, 21 NY3d at 272 ["[a]lthough defendant takes issue with the officer's removal of the speakers by arguing that such action was a ruse designed to search for drugs," the officer who conducted the search testified "that it was police protocol to remove any owner-installed equipment"]).
We note that the People, and our colleagues in the dissent, fail to cite to a single example where this criterion was satisfied without the testimony of the officer who actually conducted the inventory of the items in the vehicle or actually located the evidence sought to be [*11]suppressed.
Moreover, it is undisputed that the inventory form admitted at the hearing contained a description of the contents of two other bags located in the vehicle. However, there is no description of the contents of the purse that was recovered. The inventory form does not list the black plastic bag or the cocaine, two items allegedly in the purse when it was searched. In the absence of evidence providing an explanation or justification, this kind of inconsistent treatment indicates the exact kind of unfettered discretion that a standardized procedure is intended to guard against.
In the context of an inventory search, the police must be acting pursuant to a specific standardized criteria or routine in order to lawfully open closed containers found in a vehicle (see Florida v Wells, 495 US 1; see generally 1 Barry Kamins, New York Search & Seizure § 5.05[6][c]). At a suppression hearing, the People have the burden of demonstrating that the opening of any closed container was performed pursuant to a standardized criteria or routine before the search of that container may be upheld (see Florida v Wells, 495 US at 4-5; Colorado v Bertine, 479 US at 376; People v Taylor, 92 AD3d at 962; see also 3 Wayne R. LaFave, Search and Seizure § 7.4[a]; 1 Barry Kamins, New York Search & Seizure § 5.05[6][c]; Gary Muldoon, Handling a Criminal Case in New York § 9:81 [Sept. 2020 Update]).
As previously discussed, in Florida v Wells (495 US 1), the United States Supreme Court stated, "Our view that standardized criteria . . . or established routine . . . must regulate the opening of containers found during inventory searches is based on the principle that an inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence" (id. at 4). "We hold that absent such a policy, the instant search was not sufficiently regulated to satisfy the Fourth Amendment" (id. at 5).
Here too, the People failed to present evidence to establish a standardized policy with respect to closed containers located in a vehicle during an inventory search (see id. at 4-5; Colorado v Bertine, 479 US at 376; People v Taylor, 92 AD3d at 962). "[A]bsent such a policy [regulating the opening of containers], the instant search was not sufficiently regulated to satisfy the Fourth Amendment" (Florida v Wells, 495 US at 5; see Colorado v Bertine, 479 US at 376; see also People v Gomez, 13 NY3d at 11).
Our colleagues in the dissent respectfully disagree with our analysis of the "closed container" issue. Before their brief discussion of the substantive merits of that issue, however, they engage in an extended analysis of the defendant's appellate brief, parsing and construing the defendant's assertions into a series of straw man arguments. Our dissenting colleagues reject our analysis as infringing on the People's "due process" rights, and suggest that this Court should have permitted the People an opportunity to submit a supplemental brief on this "closed container" issue (id.).
We have cited or quoted to the portions of the defendant's appellate brief upon which we have relied in construing his arguments above, and they speak for themselves. However, in the event that the People share the view of our colleagues in the dissent and feel that our analysis of the issue is unfair to them, we note that they may move in this Court for leave to reargue the appeal, and thereby draw our attention to any portion of the record or legal authority that we may have misapprehended or overlooked (see 22 NYCRR 1250.16[d]).
However, the defendant's appellate challenge to the purported inventory search should come as no surprise to the People, and they do not contend that it is unpreserved. Indeed, it was specifically argued at the suppression hearing that "Trooper Tierney did not testify," and that "[t]here was no evidence of what the policy was with the State Police performing inventory searches or that being adhered to." It was further argued that "neither of th[e] [testifying] Troopers saw Trooper Tierney originally pick up the pocketbook" and "there's an issue as to whether he then went into a closed container, whether he had any reason to go into that container" (emphasis added).
Assigned counsel's failure to cite to Florida v Wells (495 US 1), or to any other particular case or authority, does not justify our dissenting colleagues' conclusion that the defendant has now abandoned this preserved and dispositive constitutional issue. To the extent that assigned counsel's brief is ambiguous on this point, and therefore subject to different reasonable interpretations, we decline to construe it in a manner that would render it "a mockery of justice" (People v Baldi, 54 NY2d 137, 146 [internal quotation marks omitted]; see generally People v Alvarez, 33 NY3d 286, 292; cf. People v Turner, 5 NY3d at 481).
Despite assigned counsel's failure to cite to Florida v Wells (495 US 1), our [*12]colleagues in the dissent reach the merits of this "closed container" issue and conclude that the People's evidence is sufficient. In so doing, they devote significantly more space to justifying the need to supplement the People's proof by taking judicial notice of the State Police's policy with respect to closed containers. In our view, the considerable time and attention devoted to exploring the means by which the People's case could be supplemented at this late stage to sustain their burden of proof reflects a rather dim view of the relative strength of the proof that was actually presented by the People at the hearing. In any event, we note that our dissenting colleagues are unable to plainly describe the condition of the purse when it was located by Trooper Tierney, and they make no factual finding that the purse was open or closed at the time it was recovered by him. In their brief discussion of the actual merits of this issue, our dissenting colleagues instead resort to the conclusion that "it is unclear whether the purse and the plastic bag[s] constituted 'closed containers' under the law."
Of course, this inability to discern the applicable legal standard is a consequence of the People's failure, in the first instance, to demonstrate the condition of the evidence when it was located and to otherwise prove how the inventory was conducted. In other words, because the People failed to prove whether the various containers in the vehicle were open or closed when they were first encountered by a law enforcement officer, it is impossible to determine whether "plain view" or "closed container" jurisprudence is applicable (cf. People v Leonard, 119 AD3d at 1239 ["due to the insufficiency of the proof at the suppression hearing, we lack the information necessary to arrive at such conclusions absent conjecture"]).
Despite their apparent desire to take judicial notice of additional evidence, our dissenting colleagues go on to conclude that the People presented sufficient evidence to establish a standardized policy with respect to closed containers encountered in a vehicle during an inventory search. Their conclusion is supported by a single sentence: "[e]ven assuming . . . that the purse and plastic bag constituted closed containers, Trooper Hunter testified that the troopers were required to go through 'everything that's in the vehicle.'"
No other citation to the record is provided. No other factual finding is made. As the dissenting opinion reflects, there was no actual testimony at the hearing about the State Police policy regarding closed containers, even though the issue was specifically raised by the defense. In any event, even if there had been evidence of a specific policy with respect to closed containers, there was no evidence that Trooper Tierney was aware of that procedure at the time of the search or that he actually followed it. No amount of supplemental briefing or judicial notice will alter that fact.
It is worth noting that the most relevant testimony on this point actually came from Trooper Hunter when he was asked during cross-examination about the normal procedure he utilized when a person's wallet, pocketbook, or bag was discovered during an inventory search:
"Q And normally if you were doing an inventory search of a car and you found what appeared to be the driver's wallet in the car, wouldn't you just give that to the driver?
"A Yes.
"Q And if you found a woman's pocketbook and she was a driver or passenger in the car, you would give her the pocketbook, would that be correct?
"A Yes.
"Q If you saw a bag in the car, it would be normal procedure to say, Miss, is this your bag that you left in the back seat and do you want to take it out?
"A Yes."
There is nothing in the record to show that Trooper Tierney was aware of the procedure described by Trooper Hunter, or that it was Trooper Tierney's general practice to follow it. In any event, the record affirmatively demonstrates that he did not follow it here. Accordingly, to the extent that there is any testimony about the "normal" inventory procedure undertaken by State [*13]Troopers under the circumstances presented in this case, it is evident that the procedure was not actually followed (see People v Elpenord, 24 AD3d 465, 467).
We reiterate that "[i]n the absence of a warrant from a neutral and detached Magistrate, it is an established procedure clearly limiting the conduct of individual officers that assures that the searches are carried out consistently and reasonably and do not become little more than an excuse for general rummaging to discover incriminating evidence" (People v Galak, 80 NY2d at 719). Here, "[e]ven assuming such a policy existed, the People failed to produce evidence demonstrating . . . that this particular officer conducted this search properly and in compliance with established procedures" (People v Johnson, 1 NY3d at 256 [citation omitted]; see People v Gomez, 13 NY3d at 11; People v Espinoza, 174 AD3d at 1064; People v Bacquie, 154 AD3d at 650; People v Leonard, 119 AD3d at 1238-1239; People v Russell, 13 AD3d at 657; cf. People v Padilla, 21 NY3d at 272). Accordingly, on this basis alone, the inventory search conducted here was constitutionally infirm as a matter of law (cf. CPL 470.15).
iii. Pretext
Finally, the Court of Appeals has held that an inventory search will be constitutionally invalid where the search was merely a pretext to search for evidence of a crime (see People v Johnson, 1 NY3d at 257; see also People v Lewis, 217 AD2d at 592-593). In this respect, the Court has distinguished between pretextual traffic stops and pretextual inventory searches (see People v Johnson, 1 NY3d at 257).
Indeed, as previously recognized, "where a police officer has probable cause to detain a person temporarily for a traffic violation, that seizure does not violate the Fourth Amendment to the United States Constitution even though the underlying reason for the stop might have been to investigate some other matter" (People v Robinson, 97 NY2d at 348; see Whren v United States, 517 US 806; see generally 3 Wayne R. LaFave, Search and Seizure § 7.5[e] [6th ed Sept. 2020 Update]).
Accordingly, the "ulterior motives" (Whren v United States, 517 US at 811) of a police officer in performing a vehicle stop do not "invalidate police conduct that is justifiable on the basis of probable cause to believe that a violation of law has occurred" (id.). By contrast, a valid inventory search does not require probable cause, and if a particular search was not actually conducted for the purpose of inventory or administrative regulation, "the exemption from the need for probable cause (and warrant)" will not apply (id.; see generally 3 Wayne R. LaFave, Search and Seizure § 7.5[e]).
Accordingly, in the absence of probable cause, a purported inventory search violates the State and Federal Constitutions if its "primary purpose" was to find evidence of a crime rather than to protect against claims of lost or stolen property (People v Lee, 29 NY3d 1119, 1120; see People v Johnson, 1 NY3d at 257; People v Lewis, 217 AD2d at 592-593; People v Wright, 285 AD2d 984, 985). The determination of whether a purported inventory search was actually "a ruse to look for contraband" (People v Lee, 29 NY3d at 1120) will present "mixed questions of law and fact" where, as here, witness credibility is at issue and varying inferences may be drawn from the evidence (id.).
There is a strong indication that the purported inventory search in this case was actually a pretext to search for contraband. Contrary to the conclusion of our dissenting colleagues, there is no basis to conclude that the primary purpose of the search was to inventory and safeguard the miscellaneous items in the vehicle, and that the vehicle would not have been searched had the registration been valid. The fact that the registration was not current merely served as a pretext to search the vehicle, much like the traffic violation served as a pretext to stop it:
"[DEFENSE COUNSEL]: Not you directly, but through another trooper, there was a directive to stop that particular vehicle, was there not?
"[TROOPER CABAN]: There was.
"[DEFENSE COUNSEL]: Okay. So, irrespective, that car was going to be stopped, can we agree on that?
"[TROOPER CABAN]: You could.
"[DEFENSE COUNSEL]: I'm sorry?
"[TROOPER CABAN]: Yes."
The idea that the State Troopers in this case would have let the defendant and her codefendant drive free had the registration been up to date is simply unsupportable.
As the defendant correctly contends, the record indicated that Trooper Tierney had been directed, hours before the vehicle even appeared on the roadway, to stop and search the vehicle because it was believed to contain narcotics. The weight of the evidence demonstrates that the traffic stop, although lawful, was pretextual. Although a pretextual traffic stop may be lawful where is based on probable cause (see People v Robinson, 97 NY2d at 348), "the pretextual nature of an otherwise lawful stop or arrest . . . can turn out to be powerful evidence of the pretextual/unconstitutional nature of a vehicle inventory conducted thereafter" (3 Wayne R. LaFave, Search and Seizure § 7.5[e] [emphasis added]; see People v Espinoza, 174 AD3d at 1064; People v Elpenord, 24 AD3d at 467).
Trooper Hunter candidly testified that, under normal circumstances, he would not inventory the contents of a pocketbook if he thought the owner was present during an inventory search, but rather, he would seek to return the pocketbook to the owner. In the absence of any other explanation, the fact that the pocketbook in this case was immediately searched further supports the conclusion that the primary purpose of the Troopers was to discover contraband, not to safeguard the defendant's and the codefendant's property, or to protect against the possibility of future claims of loss.
Nor should the obvious factual inconsistencies in the People's alternative arguments be ignored. It must be recognized that the People have argued, both to the County Court and to this Court, that as a factual matter, the State Troopers actually located the subject evidence during a search based on probable cause to believe that narcotics were present. In other words, as the court evidently concluded, the People contend that the cocaine was recovered pursuant to a probable-cause-based search conducted solely to recover evidence, and that the same search was simultaneously an inventory search conducted primarily to safeguard property and protect against claims of loss.
This is hardly a case where "there is no indication that the officers suspected that they would discover evidence of further criminal activity in defendant's vehicle" (People v Tardi, 28 NY3d at 1078; cf. People v Gonzalez, 62 NY2d 386, 391). To the contrary, the County Court actually concluded that the intercepted communications and the application of the fellow officer rule provided a lawful basis for Trooper Tierney to search the vehicle for narcotics at the outset of the traffic stop.
In addition, Trooper Tierney reportedly detected the odor of marihuana before he searched the vehicle. As indicated, the County Court concluded, and the People contend on appeal, that Trooper Tierney actually searched the vehicle because he had probable cause to believe that marihuana was inside.
Without Trooper Tierney's testimony, there is no direct evidence of whether Trooper Tierney was primarily looking for cocaine or for marihuana when he searched the vehicle. Certainly, he did not testify that his primary purpose was to safeguard the miscellaneous items in the vehicle and protect them against future claims of loss. Since he did not testify, there is no credibility determination to make.
Other than to generally identify the side of the vehicle that Trooper Tierney searched, there is no description of the procedure that Trooper Tierney actually undertook in conducting the purported inventory. There is no testimony about any items being inventoried, except for the purse which contained cocaine. The vague and conclusory description of the brief "inventory" here was more consistent with a search for contraband in that the testimony centered around the search for contraband and the testimony about the search ended when the cocaine was located (cf. People v Williamson, 81 AD2d 963, 964 [purported inventory search deemed pretextual where "[the] Trooper . . . testified on direct examination that he conducted a search of defendant's vehicle which he apparently abandoned upon discovering the incriminating packets"]).
The People had the burden of demonstrating that the inventory of the subject vehicle was motivated by legitimate concerns, and that it was not a pretext to discover incriminating evidence (see People v Williamson, 81 AD2d at 964; see generally Gary Muldoon, Handling a Criminal Case in New York § 9:85 [Sept. 2020 Update]). Here, as a factual matter, the People failed to sustain this burden. The record fails to support the County Court's conclusion that the "primary [*14]purpose" of Trooper Tierney's search in this case was to safeguard the property located in the vehicle and protect against possible future claims of loss (People v Lee, 29 NY3d at 1120; see People v Johnson, 1 NY3d at 257 [inventory search unlawful where "the hearing court . . . concluded the claim that the search was an inventory search was 'less than a believable claim and it appears to be merely a pretext to cover for what was the officer's desire in the first place, to see what the defendant was up to and to somehow get into the interior of his car to see if the defendant was in possession of contraband or the weapon'"]; People v Espinoza, 174 AD3d at 1064 [inventory search unlawful where "the record supports [the] conclusion that the alleged inventory search was a 'pretext' to locate incriminating evidence"]; People v Elpenord, 24 AD3d at 467 [inventory unlawful where "the inventory search appears to have been a pretext, under which the police could search the car for evidence relating to the reported shooting, without probable cause"]).
iv. Inventory Conclusion
In sum, as the defendant correctly contends, the People failed to sustain their burden of demonstrating that the physical evidence was discovered during the course of a valid inventory search.
4. Search Conclusion
Directed to recover evidence from a vehicle without a warrant, we agree with our colleagues in the dissent to the extent that they conclude that the State Troopers in this case were placed in an "untenable position." They further conclude, however, that "[u]nder the majority's analysis, the troopers could lawfully stop the vehicle but, upon discovering that the vehicle was unregistered due to an insurance lapse, they would be required to let the defendant drive away in an unregistered vehicle, because to impound the car would cross a pretextual line" (id.).
The reader may judge for themself whether this characterization is either fair or accurate. In the event that our analysis has not been clear to this point, however, we return again to the place where our analysis began: the warrant requirements of the State and Federal Constitutions (see US Const 4th Amend; NY Const, art I, § 12; see also People v Hodge, 44 NY2d at 557).
When law enforcement officials blatantly ignore the available warrant procedures and rely instead upon exceptions to the constitutional warrant requirements, the admissibility of any evidence actually recovered is needlessly jeopardized, and the considerable resources invested in the investigation expended without purpose. Moreover, as this case well-illustrates, this dubious strategy of purposefully evading judicial oversight places undue pressure upon the officers in the field to improvise constitutional exceptions on command, by navigating a complex and shifting area of constitutional law.
To address our dissenting colleagues' concerns, we think it is enough to observe that when law enforcement officers believe evidence of a crime is contained in a vehicle and yet they find that they are unable to satisfy the applicability of any of the exceptions to the constitutional warrant requirements, they should seek and obtain a warrant to validate the stop and the search before the rummaging begins (see US Const 4th Amend; NY Const, art I, § 12). There is no excuse for the failure to obtain a warrant in this case, either before the vehicle appeared on the roadway or after it had been stopped and secured, and we will not further entertain the argument that compliance with the State and Federal Constitutions is somehow an intolerable hindrance to current law enforcement practices.
Since the People failed to demonstrate at the hearing that the search of the vehicle complied with the warrant requirements of the State and Federal Constitutions, the County Court should have granted that branch of the defendant's omnibus motion which was to suppress the physical evidence that was recovered during that search. Under these circumstances, the judgment must be reversed, the indictment dismissed insofar as asserted against the defendant, and the matter remitted to the County Court, Rockland County, for the purpose of entering an order in its discretion pursuant to CPL 160.50. We need not, and do not, reach the defendant's remaining contentions.
Accordingly, the judgment is reversed, on the law and the facts, that branch of the defendant's omnibus motion which was to suppress physical evidence is granted, the indictment is dismissed insofar as asserted against the defendant, and the matter is remitted to the County Court, Rockland County, for the purpose of entering an order in its discretion pursuant to CPL 160.50.
WOOTEN, J., concurs.
ORDERED that the judgment is reversed, on the law and the facts, that branch of the defendant's omnibus motion which was to suppress physical evidence is granted, the indictment is [*15]dismissed insofar as asserted against the defendant, and the matter is remitted to the County Court, Rockland County, for the purpose of entering an order in its discretion pursuant to CPL 160.50.
CHAMBERS, J., concurs, and votes to reverse the judgment, on the law and the facts, grant that branch of the defendant's omnibus motion which was to suppress physical evidence, and dismiss the indictment insofar as asserted against the defendant, with the following memorandum:
I fully concur with the disposition of this appeal set forth in the comprehensive majority opinion penned by my colleague, Justice Miller, but write separately to emphasize a few points.
My colleagues in the majority and the dissent all agree that the stop of the subject vehicle was lawful based, inter alia, on Trooper Caban's credible testimony that the vehicle was speeding, but that the People failed to establish the validity of the ensuing search either under the fellow officer rule or under the automobile exception to the warrant requirement. I concur with these conclusions.
Thus, the only substantive point of disagreement between the majority and the dissent centers around the validity of the inventory search.
As a threshold matter, I note that the reason proffered for the inventory search, i.e., the question of whether the vehicle's registration had been suspended, while vigorously litigated by counsel at the pretrial hearing, is not pressed by the defendant on appeal. Under these circumstances, I decline to express any views on this subject and proceed—as I must—under the assumption that the People established a proper basis for conducting an inventory search (see e.g. People v Jackson, 16 AD3d 1022, 1023; People v Shepley, 185 AD2d 862, 863).
The dispositive issue, therefore, is whether the inventory search was properly conducted by the New York State Troopers. For the following reasons, I conclude that it was not.
"An inventory search is exactly what its name suggests, a search designed to properly catalogue the contents of the item searched. The specific objective[ ] of an inventory search, particularly in the context of a vehicle, are to protect the property of the defendant, to protect the police against any claim of lost property, and to protect police personnel and others from any dangerous instruments. . . . [A]n inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence" (People v Johnson, 1 NY3d 252, 256 [citation and internal quotation marks omitted]).
"When determining the validity of an inventory search, 'two elements must be examined: first, the relationship between the search procedure adopted and the governmental objectives that justify the intrusion and, second, the adequacy of the controls on the officer's discretion'" (People v Gomez, 13 NY3d 6, 10, quoting People v Galak, 80 NY2d 715, 719).
Applying these basic principles to the facts of this case, we know from Trooper Hunter's testimony at the pretrial hearing that the troopers had a written protocol for conducting inventory searches. While a copy of the written protocol need not be submitted into evidence, the People must still proffer a sufficient description of what the standardized search procedure requires (see People v Gomez, 13 NY3d at 11; People v Taylor, 92 AD3d 961, 962). Here, when asked to describe the standardized procedure, Trooper Hunter was vague on direct examination, stating only, "we go through the vehicle and we note all the valuables and so forth." When pressed for more information about the procedure on cross-examination, Trooper Hunter responded, "I don't recall. It doesn't tell you directly what area to search . . . or how to go about the search, it tells you what you're documenting and so forth." Trooper Hunter added that the troopers were required to fill out a form documenting any damage to the vehicle and listing "any type of valuables that are in the vehicle, anything—car seats, clothing."
Surely, if the standardized procedure in this case were limited to what Trooper Hunter actually described, namely a generalized instruction to "go through the vehicle" and "note all the valuables," it would be difficult, if not impossible, to conclude that such a procedure is designed to meet the legitimate objective of the search while limiting the discretion of the officer in the field (see People v Galak, 80 NY2d at 716).
In any event, even if Trooper Hunter's testimony could be deemed sufficient to establish the existence of a constitutionally valid standardized procedure, the People put forth no evidence that the troopers actually complied with such procedure. Indeed, we know from the evidence adduced at the hearing that the drugs in this case were found inside a black plastic bag located within the defendant's pocketbook, which was reportedly found by Trooper Tierney in the [*16]back passenger seat of the vehicle. Neither Trooper Caban nor Trooper Hunter had any firsthand knowledge of how, where, or in what condition—open or closed—the pocketbook was found by Trooper Tierney, who did not testify at the hearing. It is noteworthy that the People have neither argued nor attempted to establish that the drugs were in plain view, which would have justified their seizure (see People v Robinson, 97 NY2d 341, 346-348; People v Garcia, 175 AD3d 1319; People v Dolly, 12 AD3d 1157). To be sure, the People would have elicited that testimony had the drugs been in plain view in the back seat of the stopped vehicle.
Most significantly, here, the inventory search was conducted in the presence of a driver and the passenger who, at the inception of the search, were admittedly not under arrest. On cross-examination, Trooper Hunter was pointedly asked whether, under circumstances where a person is present and able to take possession of a small personal item found in a vehicle—such as a wallet or a pocketbook—whether it would be "normal procedure" to simply hand the item back to its owner rather than inventorying its contents and impounding it along with the vehicle. He answered, "Yes." It seems to me, this candid, common-sense response—coupled with Trooper Caban's admission that he was under directives from his colleagues at the Rockland County Drug Task Force to stop the subject vehicle irrespective of any traffic violation—provides persuasive evidence that the troopers were not adhering to a standardized procedure but were instead using the inventory search as a pretext to rummage through the vehicle looking for contraband. As the Court of Appeals has made pellucidly clear, the rationale underlying the validity of so-called pretext stops (see Whren v United States, 517 US 806; People v Robinson, 97 NY2d at 348-349) cannot be extended to justify pretext inventory searches (see People v Johnson, 1 NY3d at 257). For these reasons, which are wholly in line with binding precedent, I agree with my colleagues in the majority that the People failed to establish the validity of the inventory search.
CONNOLLY, J., dissents, and votes to affirm the judgment, with the following memorandum, in which RIVERA, J.P., concurs:
In my view, the People established that the cocaine recovered in this case was discovered pursuant to a valid inventory search, and thus, I would affirm. I would not reach the unbriefed "closed container" issue identified by my colleagues in the majority. In any event, that issue does not affect my analysis that the inventory search was valid.
I. The Charges
The defendant was charged with criminal possession of a controlled substance in the first degree and criminal possession of a controlled substance in the third degree under Indictment No. 15-00395.
II. The Suppression Hearing
At a pretrial suppression hearing, New York State Police Trooper John Caban testified that, on September 15, 2015, at approximately 1:00 a.m., he and Trooper Tierney were patrolling a northbound section of I-87 in a marked patrol car. The troopers had been told by the Rockland County Drug Task Force to be on the lookout for a 2001 black Ford Explorer, which was suspected of having narcotics inside. Caban testified that he observed a Ford Explorer matching that description and began "pacing" it, i.e., matching its speed with his patrol car, which allowed him to visually estimate that the Explorer was traveling at a rate of 65 miles per hour in a 55-mile-per-hour zone. Caban also observed the Ford Explorer "cross[ ] the line a couple of times," which he testified was a violation of the Vehicle and Traffic Law.
Thereafter, Troopers Caban and Tierney pulled over the Ford Explorer, which was driven by the codefendant, Aaron Parker. The defendant, Patricia Mortel, was a passenger in the vehicle. Two other New York State Police Troopers, Brian Hunter and Christopher Kelly, arrived at the scene. Caban testified that, as he and Tierney approached the vehicle on foot, Tierney stated that he detected the odor of marihuana. Caban asked Parker and the defendant to exit the vehicle and they complied.
Trooper Caban testified that one of the other troopers checked the license and registration and learned that the Ford Explorer's registration had been suspended because of an insurance lapse. Based upon the suspended registration, the troopers "immediately" impounded the vehicle.
While Trooper Caban stood at the rear of the Ford Explorer with Parker and the defendant, Troopers Hunter and Tierney conducted an inventory search of the vehicle. Hunter testified that the State Police has a written policy governing inventory searches. He testified that [*17]"[a]n inventory search is part of our procedure for the New York State Police when we're going to impound the car, we go through the vehicle and we note all the valuables and so forth and everything that's in the actual vehicle." He testified that "[t]he purpose" of an inventory search "is to protect both the person's vehicle that's being towed, as well as the tow company. It ensures that, for instance, if somebody gets a vehicle towed and they said they had a thousand dollars cash in the vehicle, well, there's a thousand dollars cash that would be noted." Hunter further testified that the procedure is to "go through everything that's in the vehicle."
As to the specifics of the search, Trooper Hunter testified that he "went in on the driver's side of the vehicle and Trooper Tierney went in on the passenger side of the vehicle." Hunter "started to check the driver's side of the vehicle, the area—the seats, under the seats." Simultaneously, Tierney was searching the passenger side of the vehicle. Hunter testified that while Tierney was searching the back, rear passenger side, "Trooper Tierney got my attention and showed me a black plastic bag that was in a pocketbook and in it you can see in plain view a large size brick, shape." Based upon his training and experience, Hunter deemed the object to be a brick of cocaine. At that point, Parker and the defendant were placed under arrest.
On cross-examination, defense counsel asked Trooper Hunter whether "the State Police have a set of rules or written procedures as to how to conduct an inventory search." Hunter replied that there were in fact certain rules and regulations. When asked by defense counsel to summarize the State Police rules and procedures regarding inventory searches, Hunter testified: "That we search the vehicle, we know all valuables, everything that's in the vehicle. There's an actual form that we fill out that documents all that, damage to the vehicle, any type of valuables that are in the vehicle, anything—car seats, clothing." Hunter agreed with defense counsel that, had the vehicle's registration not been suspended, there would have been no need to conduct an inventory search. The one-page "Vehicle Impound and Inventory Record" was introduced into evidence at the suppression hearing by the defendant.
Trooper Caban issued Parker standard traffic tickets for operating a vehicle while registration was suspended/revoked, speeding, operating without insurance, and failing to keep right, which tickets were admitted into evidence at the hearing and are contained within the record on appeal.
Although Trooper Tierney did not testify at the suppression hearing, the prosecutor stated on the record that Tierney was unable to appear at the hearing due to an injury that rendered him unable to work.
The defendant did not call any witnesses at the suppression hearing. Parker called one witness, his mother, Fredericka Parker (hereinafter Fredericka), who testified that Parker called her at approximately 1:00 a.m. from the scene of the traffic stop. Later that same day, Fredericka went to Dom's Towing to pick up the Ford Explorer. Ferdericka testified that she was able to pick up and drive the vehicle away by paying $332.71, and that she was not required to present any proof of insurance.
In rebuttal, the People presented the testimony of Jeanna Cook, an employee of Dom's Towing, who testified that, contrary to the testimony of Fredericka, the Ford Explorer was not picked up until four days after it was impounded. The People also called Investigator Philip Fantasia, who testified that, based upon his review of records received from the Department of Motor Vehicles, the vehicle's registration was suspended on July 24, 2015, for an insurance lapse, and the suspension was not cleared until February 8, 2016.
At the conclusion of the hearing, the defendant and Parker argued that the People had failed to establish the validity of the inventory search. The People argued that the troopers had probable cause to arrest the occupants and search the vehicle based upon the information they received regarding the wiretap investigation, or based upon the detection of the odor of marihuana. The People also argued that the suspended registration entitled the troopers to impound the vehicle and required them to conduct an inventory search so that the vehicle could be towed.
In a posthearing decision and order dated June 20, 2016, the County Court found, inter alia, that the troopers had reasonable cause to stop the Ford Explorer based upon their observations that traffic infractions had been committed. The court also found that the inventory search of the vehicle was valid.
III. The Trial
At a subsequent jury trial, the People introduced evidence, inter alia, that the substance recovered from the Ford Explorer was cocaine. The People also introduced wiretap [*18]recordings in which a voice, identified by Investigator Fantasia as the defendant, could be heard speaking in language coded to conceal her involvement in the sale and delivery of narcotics.
At the conclusion of the trial, the jury convicted the defendant of criminal possession of a controlled substance in the first degree and acquitted her of criminal possession of a controlled substance in the third degree. The defendant appeals.
IV. Arguments on Appeal
On appeal, the defendant contends that the cocaine recovered from the vehicle should have been suppressed because the traffic stop was a pretext to investigate a separate matter. The defendant argues that the People failed to establish their entitlement to search the vehicle under the automobile exception or under the plain view exception to the warrant requirement. The defendant also contends that the inventory search was invalid because the testimony regarding the inventory search policy was "vague" and because the People never offered the policy into evidence. The defendant contends that Trooper Tierney's testimony was necessary at the suppression hearing to establish the validity of the inventory search, because he was, among other things, the person who discovered the cocaine. The defendant raises separate contentions that a police witness's identification of her voice should have been suppressed, that the evidence at trial was legally insufficient to establish her guilt, and that she was denied the effective assistance of counsel.
In opposition, the People contend that the troopers had probable cause to stop the vehicle based upon their observation that the vehicle's operator committed traffic infractions. The People argue that the search was valid based upon information received by fellow officers in the Rockland County Drug Task Force, based upon the detection of the odor of marihuana, or as a valid inventory search. The People argue that the defendant was not entitled to pretrial notice or hearings with respect to a police witness's identification of her voice on wiretap recordings introduced into evidence at trial. The People also argue that the evidence of the defendant's guilt was legally sufficient and that the verdict was not against the weight of the evidence. Finally, the People argue that the defendant received the effective assistance of counsel.
V. The Stop was Constitutional
Contrary to the defendant's contention, the County Court properly denied that branch of her omnibus motion which was to suppress the cocaine recovered from the vehicle. The People established that there was probable cause for the state troopers to stop the vehicle, based upon Trooper Caban's observations that Parker was driving above the posted speed limit and that he failed to stay within his lane of travel (see People v Robinson, 97 NY2d 341, 349).
Although the defendant contends that the traffic stop was pretextual in light of an advisory the troopers received from the Rockland County Drug Task Force to be on the lookout for the vehicle, "provided a traffic stop is supported by probable cause, 'neither the primary motivation of the officer nor a determination of what a reasonable traffic officer would have done under the circumstances is relevant'" (People v Wright, 98 NY2d 657, 658-659, quoting People v Robinson, 97 NY2d at 349).
The defendant's claim on appeal that "[n]o infractions for [speeding or failing to stay within the lane of travel] were ever issued" is flatly contradicted by the record. Trooper Caban issued Parker standard traffic tickets for operating a vehicle while registration was suspended/revoked, speeding, operating without insurance, and failing to keep right, which tickets were admitted into evidence at the hearing and contained within the record on appeal.
VI. The Inventory Search was Valid
For the reasons that follow, I conclude that the People established that the inventory search was valid. Although academic in light of my analysis, I agree with my colleagues in the majority that the People failed to establish the validity of the search under the fellow officer rule or the automobile exception to the warrant requirement.
A. The People Established a Valid Inventory Search
Inventory searches are a "well-defined exception to the warrant requirement of the Fourth Amendment. The policies behind the warrant requirement are not implicated in an inventory search, nor is the related concept of probable cause" (Colorado v Bertine, 479 US 367, 371 [citations omitted]; see People v Galak, 80 NY2d 715, 719). "[I]nventory procedures serve to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger" (Colorado v Bertine, 479 US at 372; People v Johnson, 1 NY3d 252, 256).
"While incriminating evidence may be a consequence of an inventory search, it [*19]should not be its purpose" (People v Johnson, 1 NY3d at 256). Thus, incriminating evidence found during a valid inventory search will not be suppressed (see People v Padilla, 21 NY3d 268, 272; People v Johnson, 1 NY3d at 256). In order to further the goals justifying the exception, even where a vehicle has been lawfully impounded, the inventory search itself must be conducted pursuant to "an established procedure clearly limiting the conduct of individual officers that assures that the searches are carried out consistently and reasonably" (People v Galak, 80 NY2d at 719; see People v Padilla, 21 NY3d at 272; People v Johnson, 1 NY3d at 256). The People bear the burden of demonstrating the validity of an inventory search (see People v Padilla, 21 NY3d at 272; People v Gomez, 13 NY3d 6, 11).
Here, because the vehicle lacked a valid registration due to an insurance lapse, the troopers were entitled to impound the vehicle and were required to conduct an inventory search (see People v Walker, 20 NY3d 122, 125; see also People v Padilla, 21 NY3d at 272). The People established that the inventory search was conducted pursuant to an established, reasonable procedure and that the troopers prepared a meaningful inventory list recording the property contained in the Ford Explorer, before releasing it to a private tow company (see People v Walker, 20 NY3d at 127 ["The police must follow a reasonable procedure, and must prepare a meaningful inventory list" (internal quotation marks omitted)]).
Without reaching the issue, the majority surmises, in effect, that the evidence at the hearing was insufficient to establish that the vehicle's registration was in fact suspended. The majority calls this a "preserved and dispositive" issue but declines to reach it because the defendant's appellate counsel did not brief it. To the extent the majority is compelled to even discuss this unraised issue, it should be noted that there was ample uncontradicted evidence at the hearing that the troopers ran the vehicle's registration at the scene of the traffic stop and learned that it had been suspended for an insurance lapse. Parker was in fact issued a ticket for operating a vehicle while registration was suspended/revoked. Moreover, Investigator Fantasia testified at the hearing that, based upon his review of Department of Motor Vehicles records, the vehicle's registration was in fact suspended prior to the traffic stop in question and the suspension was not cleared until the following year. The majority ignores this evidence. Thus, although the majority is critical of appellate counsel's failure to raise the issue of whether the vehicle was lawfully impounded due to a suspended registration, in my view, the issue is utterly lacking in merit.
Moreover, the People were not required to offer a written copy of the standardized inventory procedure into evidence. While the better practice is to offer a copy of such written policy, testimony describing the policy "in general terms" (People v Walker, 20 NY3d at 125), may be "sufficient to meet the constitutional minimum" (id. at 127). Trooper Hunter testified that the State Police have a written procedure for conducting inventory searches, which entails going through the vehicle and noting all of the valuables to protect both the owner and the tow company, which was sufficient to establish the procedure. Specifically, Hunter testified as follows: "[a]n inventory search is part of our procedure for the New York State Police when we're going to impound the car, we go through the vehicle and we note all the valuables and so forth and everything that's in the actual vehicle"; and "[t]he purpose" of an inventory search "is to protect both the person's vehicle that's being towed, as well as the tow company. It ensures that, for instance, if somebody gets a vehicle towed and they said they had a thousand dollars cash in the vehicle, well, there's a thousand dollars cash that would be noted." When viewed in its totality, Hunter's testimony provided a sufficiently detailed description of the State Police's standardized inventory search policy (see People v Walker, 20 NY3d at 124-125 [State Trooper's testimony was sufficient where he "described the policy in general terms"]; cf. People v Russell, 13 AD3d 655, 657 ["there was no testimony from the officer about his knowledge of the general objectives of an inventory search or to establish the existence of any departmental policy regarding inventory searches"]).
B. The Inventory List was Sufficiently Detailed
I disagree with the majority's concerns regarding the detail of the entries on the Vehicle Impound and Inventory Record. In my view, the inventory list created in this case was meaningful and sufficient.
"[A] meaningful inventory list" is the "hallmark of an inventory search" (People v Johnson, 1 NY3d at 256). The Vehicle Impound and Inventory Record, which was offered into evidence by the defendant, lists Parker as the driver and lists the name and address of a nonparty as the vehicle's owner. The form indicates that Trooper Tierney was the officer who called the private tow operator requesting that the vehicle be towed. The form notes areas of the vehicle that were [*20]damaged, including the "rear center," as well as "misc dents in rear," which is consistent with cataloguing the vehicle's condition for purposes of protecting both the owner and the tow company. The form indicates that the inventory search commenced at 1:10 a.m. and concluded at 1:34 a.m. Consistent with Trooper Hunter's testimony as to the manner in which the search was conducted, boxes on the form are checked to indicate that the front seat, rear seat, glove box, and console were searched. The form lists the following description of "[i]nterior [v]aluables": "NUMEROUS PAPERS, LUGNUTS, BOLTS AND IN THE CENTER CONSOLE HAD PAPERS AND BUNCH OF CD'S. BACK SEAT HAD A BAG OF MISC FRUIT, BAG WITH GATORADE IN IT. PURSE." Further, the form states that the trunk contained "MISC CAR AUTO CLEANERS, NBUMEROUS [sic] DUMBELLS [sic] AND FREE WEIGHT AND BAR, MORE CD'S IN A BAG AND UMBRELLA."
The inventory list generated in this case was indeed more detailed than the "slipshod" inventory list found to be valid by the Court of Appeals in People v Walker (20 NY3d 122). In that case, according to the defendant's brief filed in the Court of Appeals, "[t]he form completed by [the trooper] contained only three entries: 'miscellaneous' items found in the trunk, 'paperwork' in the glove compartment, all of which was returned to appellant, and the gun, which was seized" (brief for defendant-appellant in People v Walker, 20 NY3d 122, available at 2012 WL 6732950, *8). The defendant contended on appeal that "the written policy that governed the search was never produced; the state trooper's description of the policy was very vague; and the descriptions of the returned property on the inventory form . . . would be of limited usefulness in the event the car's owner claimed that some of her property was missing" (People v Walker, 20 NY3d at126-127). The Court of Appeals noted that, although "it would be better for a prosecutor seeking to prove the existence of a written policy to put a copy of the policy into evidence . . . defense counsel could have demanded that the policy be produced to help her cross-examine the trooper" (id. at 127). The Court of Appeals upheld the search, holding that the driver of a vehicle that has been lawfully impounded "presumably expects the police to find whatever is in the car" (id.). "The police must follow a reasonable procedure, and must prepare a meaningful inventory list. But it would serve little purpose for courts to micromanage the procedures used to search properly impounded cars. The United States Supreme Court implicitly recognized as much in Bertine by upholding as constitutionally valid a search producing what a trial court had found to be a somewhat slipshod inventory" (id. [internal quotation marks omitted]).
Although the majority criticizes the detail of the entries on the inventory form, in United States v Lopez (547 F3d 364, 371 [2d Cir]), the United States Court of Appeals for the Second Circuit made clear that officers are not required to separately itemize each object found during an inventory search:
"Nor do we find merit in Lopez's argument that the failure to itemize each object found in the car, instead of covering items of lesser value under a general catch-all category of 'personal belongings,' is incompatible with the Supreme Court's warning that 'inventory searches should be designed to produce an inventory.' The search did produce an inventory. The concept of an inventory does not demand the separate itemization of every single object. A conventional family automobile is likely to contain a bunch of road maps, pens and a notepad, a bottle opener, packs of chewing gum or candy, clip-on sunshades, a pack of tissues, a vanilla-scented deodorizer, DVDs and children's games, a baby bottle and a soiled baby blanket, an old sock, a sweater, windshield cleaning fluid, jumper cables, a tow rope, a tire iron and jack, a first aid kit, and emergency flares, not to mention empty candy wrappers and wads of chewed gum. That an officer might use a catch-all to cover objects of little or no value in no way casts doubt on the officer's claim that the purpose of the search was to make an inventory" (id. at 371 [citation omitted]).
Thus, in my view, the Vehicle Impound and Inventory Record offered into evidence in this case was sufficiently detailed and demonstrates that a meaningful inventory of the vehicle's contents was made (see People v Walker, 20 NY3d 122).
I also disagree with the majority's conclusion that Trooper Tierney's testimony was necessary to establish how the inventory search was conducted. Trooper Hunter testified that he personally participated in the search and simultaneously searched the vehicle with Tierney. Additionally, there was no challenge to the authenticity of the Vehicle Impound and Inventory [*21]Record, which was offered into evidence by the defendant. Under these circumstances, Hunter's testimony was sufficient for the People to meet their burden at the hearing. To the extent that the majority implies that Hunter's testimony constituted hearsay, I note that "hearsay evidence is admissible [at a suppression hearing] to establish any material fact" (CPL 710.60[4]; see United States v Raddatz, 447 US 667, 679).
C. The Inventory Search was not Pretextual
On the issue of pretext, I agree with my colleagues in the majority that there is no basis to disturb the County Court's credibility determination that the troopers possessed probable cause to stop the subject vehicle based upon their observations that the vehicle's operator committed certain traffic infractions. Under Whren v United States (517 US 806) and People v Robinson (97 NY2d 341), the troopers' "primary motivation" to investigate other alleged criminal activity is not relevant to determining whether there was probable cause to initiate the stop (People v Robinson, 97 NY2d at 349-350; see People v Wright, 98 NY2d at 658 [suppression motion improperly granted "on the ground that the Trooper used defendant's traffic infraction as a pretext to investigate" a separate matter]).
While I also agree with my colleagues in the majority that an inventory search should not be used as a pretext to search for evidence (see e.g. People v Galak, 80 NY2d 715), I disagree with my colleagues' conclusion that the People failed to establish that the inventory search in this case should not be invalidated as pretextual. Notably, Trooper Hunter agreed with defense counsel that, had the vehicle's registration not been suspended, there would have been no need to conduct an inventory search.
Moreover, since the troopers were undisputably permitted to stop the vehicle for pretextual reasons upon observing the commission of traffic infractions, the majority's holding that the inventory search should be invalided as a pretextual search for evidence of a crime would leave the troopers in this case in an untenable position. Under the majority's analysis, the troopers could lawfully stop the vehicle but, upon discovering that the vehicle was unregistered due to an insurance lapse, they would be required to let the defendant drive away in an unregistered vehicle, because to impound the car would cross a pretextual line.
Rather, in my view, the discovery that the vehicle's registration was suspended gave the troopers an independent, nonpretexual basis to impound the vehicle. Following the discovery of the suspended registration due to an insurance lapse, the vehicle was in fact impounded and a satisfactory inventory list of the vehicle's contents was generated (cf. People v Elpenord, 24 AD3d 465, 466). Accordingly, I disagree with my colleagues' conclusion that the cocaine discovered during the inventory search should be suppressed on the ground that the search was initiated for improper motives.
VII. The Unbriefed "Closed Container" Issue Central to the Majority's Analysis Should not be Addressed
A. The Parties have not Briefed the "Closed Container" Issue Identified by the Majority
My colleagues in the majority, citing to Florida v Wells (495 US 1), conclude that the People did not meet their burden to establish the validity of the inventory search, because they failed "to establish a standardized policy with respect to closed containers located in a vehicle during an inventory search."
However, a careful reading of the defendant's brief reveals that she does not cite Wells nor make any appellate argument that the purse, or the plastic bag located within the purse, were closed containers. Nor does the defendant contend that the People failed to establish a policy regarding closed containers. These arguments concerning the "closed container" were raised sua sponte by the majority, and, therefore, should not be considered.
Appellate courts do not, as a general rule, decide cases on issues not raised by the parties. "[Courts] are not in the business of blindsiding litigants, who expect us to decide their appeals on rationales advanced by the parties, not arguments their adversaries never made" (Misicki v Caradonna, 12 NY3d 511, 519). In my view, the unbriefed issue of the "closed container" is not properly before this Court, and should not be a ground for deciding this appeal.
If this Court were to address an unbriefed, but potentially dispositive issue on appeal, the parties should be given the opportunity to submit supplemental briefing. As a matter of due process, courts should adopt the following approach with respect to potentially dispositive but [*22]unargued issues:
"If the litigants do not address a dispositive issue, the judge should consider asking counsel before oral argument to brief or orally argue the issue rather than making a sua sponte decision. This technique is consistent with due process, causes little delay, and saves the majority from encountering dissents and considering motions to reargue" (Gerald Lebovits et al., Ethical Judicial Opinion Writing, 21 Geo J Legal Ethics 237, 291 [2008]).
Where a potentially dispositive but unbriefed issue is identified after oral argument, an appellate panel may, pursuant to court rule, authorize post-argument submissions on the issue (see 22 NYCRR 1250.15[d] ["Post-Argument Submissions. Post-argument submissions are discouraged, and may be made only with leave of the court."]; see e.g. Caffrey v North Arrow Abstract & Settlement Servs., Inc., 160 AD3d 121, 127).
Thus, before reaching this unbriefed issue, as a matter of due process, this Court should have permitted the parties the opportunity to submit supplemental briefing on the "closed container" issue identified by the majority. As discussed below, by declining to request such supplemental briefing we also deprive the People of the opportunity to request, pursuant to People v Gomez (13 NY3d at 11), that we judicially notice the State Police's policies and procedures regarding the opening of closed containers.
B. The Holding of Florida v Wells
In any event, Florida v Wells settled an issue potentially left open by the United States Supreme Court in Colorado v Bertine (479 US 367). In Bertine, the Court held that "police officers may open closed containers while conducting a routine inventory search of an impounded vehicle" (id. at 376). Justice Blackmun concurred in Bertine, noting that "it is permissible for police officers to open closed containers in an inventory search only if they are following standard police procedures that mandate the opening of such containers in every impounded vehicle" (id. at 376-377 [Blackmun, J., concurring]).
Subsequently, in Florida v Wells (539 So 2d 464, 466 [Fla], affd 495 US 1), a vehicle was impounded and subjected to an inventory search. During the search, a locked suitcase was discovered in the trunk (see id. at 466). Under the direction of a Florida State Trooper, employees of the impound facility "attempted to pry open the suitcase with a knife. Some ten minutes later they succeeded, and found a garbage bag inside containing a large amount of marijuana" (id.). The Florida Supreme Court suppressed the marijuana, finding that the Florida State Highway Patrol had no "mandatory" policy with respect to the opening of closed containers. With particular focus given to Justice Blackmun's concurrence in Bertine, the Florida Supreme Court interpreted Bertine to require that a constitutional inventory policy must remove all discretion from the officers with regard to whether the container must be opened: "The police under Bertine must mandate either that all containers will be opened during an inventory search, or that no containers will be opened. There can be no room for discretion" (id. at 469).
The United States Supreme Court affirmed, but disagreed with the Florida Supreme Court's interpretation that Bertine mandated an "all or nothing" policy with respect to closed containers (Florida v Wells, 495 US at 4 [internal quotation marks omitted]). Rather, "[a] police officer may be allowed sufficient latitude to determine whether a particular container should or should not be opened in light of the nature of the search and characteristics of the container itself" (id.). "[W]hile policies of opening all containers or of opening no containers are unquestionably permissible, it would be equally permissible, for example, to allow the opening of closed containers whose contents officers determine they are unable to ascertain from examining the containers' exteriors" (id.). "The allowance of the exercise of judgment based on concerns related to the purposes of an inventory search does not violate the Fourth Amendment" (id.). Since "the Florida Highway Patrol had no policy whatever with respect to the opening of closed containers encountered during an inventory search," the Court found that the contents of the suitcase must be suppressed (id. at 4-5 [emphasis added]).
C. Judicial Notice of Inventory Search Procedures
In People v Gomez (13 NY3d at 11), the Court of Appeals held that the written inventory procedure need not be offered into evidence, and that courts in inventory search cases "may take judicial notice of the standardized search procedure."
Although the Court of Appeals did not specifically explain its rationale as to why such [*23]procedures may be judicially noticed, it follows that, since police agencies are agents of the state, their formal written policies have the same force and effect as agency rules and regulations (see e.g. State Administrative Procedure Act § 102[2] [broadly defining a "rule" to mean "the whole or part of each agency statement, regulation or code of general applicability that implements or applies law, or prescribes a fee charged by or paid to any agency or the procedure or practice requirements of any agency, including the amendment, suspension or repeal thereof"]).
All courts within this state, including appellate courts, have the power to judicially notice agency rules and regulations, even where neither party makes such a request (see CPLR 4511[b]; see also Matter of Phillies, 12 NY2d 876, 877; Caffrey v North Arrow Abstract & Settlement Servs., Inc., 160 AD3d at 127). The CPLR provides:
"Every court may take judicial notice without request of private acts and resolutions of the congress of the United States and of the legislature of the state; ordinances and regulations of officers, agencies or governmental subdivisions of the state or of the United States; and the laws of foreign countries or their political subdivisions" (CPLR 4511[b] [emphasis added]).
If judicial notice of the State Police's standardized inventory search procedure should be taken, the next question is: by what mechanism should such inventory procedure be brought before this Court? Notably, two decisions from the Appellate Division, Third Department, quote the portion of the State Police Field Manual which sets forth the policy regarding the opening of closed containers during inventory searches: "New York State Police Field Manual article 33 requires that the contents of 'ALL vehicle compartments AND all closed containers which can be opened WITHOUT causing physical damage to the compartment OR container' be inventoried" (People v Washington, 233 AD2d 684, 686 [3d Dept 1996]; see People v Walker, 194 AD2d 92, 94 [3d Dept 1993] [same]). A decision and order from this Court quotes a related portion of the same inventory procedure as to how officers are to proceed in the event that a closed container cannot be opened (see People v Lewis, 217 AD2d 591, 592-593 [2d Dept 1995] ["'If a compartment or closed container which cannot be opened without causing physical damage to the compartment or container appears likely to contain valuable property, perishable goods or property which may cause physical danger to police or other persons or damage to property, contact a member holding the rank of sergeant or higher [for permission to open the container]," quoting New York State Police Field Manual § 33Z2]).
Although the foregoing cases quote from the New York State Police Field Manual's policy regarding the opening of closed containers, and a court's power to judicially notice court records is extremely broad (see Caffrey v North Arrow Abstract & Settlement Servs., Inc., 160 AD3d at 126; Matter of Julian P. [Colleen Q.], 129 AD3d 1222, 1225; Matter of A.R., 309 AD2d 1153, 1153), it would be inappropriate to rely solely on those cases to evaluate whether the State Police's policy comports with Florida v Wells, since the State Police could have amended its written policy in the years since those cases were decided.
This Court's decision and order in People v Taylor (92 AD3d 961) provides a guide for judicially noticing inventory search procedures at the appellate level. According to the People's appendix filed in Taylor, neither the New York City Police Department (hereinafter NYCPD) patrol guide, nor its contents, were offered into evidence at the suppression hearing. Nevertheless, the judicial hearing officer who conducted the suppression hearing took judicial notice of the NYCPD patrol guide. On appeal, the People submitted the relevant pages of the NYCPD patrol guide as part of their appendix. In reaching our decision, this Court took judicial notice of the NYCPD's patrol guide: "The record supports the conclusion that the search was conducted in accordance with the [NYCPD] Patrol Guide, of which we take judicial notice" (id. at 962 [emphasis added]).
The difference between Taylor and the case at bar is that in Taylor, the parties were able to anticipate and brief the issues pertaining to compliance with the NYCPD patrol guide, whereas in the case at bar, the issue has not been briefed. Thus, unlike in Taylor, the People in the instant appeal were not put on notice to submit the written policy to this Court, since there was no indication that the "closed container" issue identified by the majority would be litigated. Accordingly, had the People been on notice that the "closed container" issue would be the subject of this appeal, they could have submitted the policy in effect at the time of the subject traffic stop to this Court, to be judicially noticed in accordance with People v Gomez (13 NY3d at 11).
D. In Any Event, the People Established a Policy of Opening All Containers
Based upon the record before this Court, I would affirm the County Court's denial of that branch of the defendant's omnibus motion which was to suppress physical evidence.
As an initial matter, it is unclear whether the purse and the plastic bag constituted "closed containers" under the law. In contrast to the case at bar, Florida v Wells (539 So 2d at 466) concerned a locked suitcase that took 10 minutes to pry open. In Florida v Jimeno (500 US 248, 251), a case involving consent searches, the United States Supreme Court held that a suspect's general consent to search a vehicle extended to examining the contents of a "a paper bag lying on the floor of the car" but not "to the breaking open of a locked briefcase within the trunk"(id. at 252; see United States v Snow, 44 F3d 133, 135 [2d Cir]). It is unclear from the case law whether, in the context of an inventory search, the same distinction applies to readily opened items such as plastic bags, as opposed to locked containers.
Even assuming, as the majority does, that the purse and plastic bag constituted closed containers, Trooper Hunter testified that the troopers were required to go through "everything that's in the vehicle." This testimony established that the officers did not have unbridled discretion to pick and choose the parts of the vehicle they deemed important to search—they were to go through "everything." Such testimony describes the type of "all or nothing" policy of opening closed containers that the United States Supreme Court held was "unquestionably permissible" (Florida v Wells, 495 US at 4 [internal quotation marks omitted]).
VIII. The Remaining Appellate Contentions Are Without Merit
The defendant's remaining contentions are without merit.
The defendant's contention that the evidence was legally insufficient to support her conviction of criminal possession of a controlled substance in the first degree is unpreserved for appellate review, as defense counsel made only a general motion for a trial order of dismissal, arguing that the People failed to make out a prima facie case (see CPL 470.05[2]; People v Hawkins, 11 NY3d 484, 491-492). In any event, viewing the evidence in the light most favorable to the prosecution (see People v Contes, 60 NY2d 620), it was legally sufficient to establish her guilt beyond a reasonable doubt. Moreover, the verdict of guilt was not against the weight of the evidence (see People v Romero, 7 NY3d 633).
The defendant's contention that she did not receive notice of a law enforcement witness's identification of her voice on wiretap recordings pursuant to CPL 710.30, is unpreserved for appellate review (see CPL 470.05[2]). In any event, the contention is without merit. CPL 710.30(1) requires that the People provide the defendant with pretrial notice where they "intend to offer at a trial . . . testimony regarding an observation of the defendant either at the time or place of the commission of the offense or upon some other occasion relevant to the case, to be given by a witness who has previously identified him or her or a pictorial, photographic, electronic, filmed or video recorded reproduction of him or her as such." The statute's focus is on "in-court identifications predicated on earlier police-arranged confrontations between a defendant and an eyewitness, typically involving the use of lineups, showups or photographs, for the purpose of establishing the identity of the criminal actor" (People v Gissendanner, 48 NY2d 543, 552). CPL 710.30 is inapplicable where, as here, "the witness did not participate in a pretrial identification procedure and there is no colorable claim of suggestiveness" (People v Lombardo, 151 AD3d 887, 888; see People v Cruz, 134 AD3d 1455, 1457; People v Morenito, 281 AD2d 928, 929). For similar reasons, there is no merit to the defendant's related unpreserved contention that the County Court erred in failing to conduct a pretrial hearing to establish an independent basis for the witness's identification of the defendant's voice (see People v Lombardo, 151 AD3d at 888; see also People v Spirles, 275 AD2d 980, 981-982; People v Medina, 208 AD2d 771, 772).
There is no merit to the defendant's contention that she was deprived of the effective assistance of counsel at trial (see People v Baldi, 54 NY2d 137, 147).
IX. Conclusion
Accordingly, I would affirm the judgment.
ENTER:
Aprilanne Agostino
Clerk of the Court



Footnotes

Footnote 1:* We respectfully disagree with our dissenting colleagues' suggestion that it is somehow improper for this Court to consider a particular case or legal authority unless it has been specifically cited by a party in their appellate brief. Our determination on this point requires no citation, but we note that the dissenting opinion itself is not consistent with such an inflexible rule.