People v Gray (2025 NY Slip Op 00249)

People v Gray

2025 NY Slip Op 00249

Decided on January 16, 2025

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:January 16, 2025

CR-23-1492
[*1]The People of the State of New York, Respondent,
v
Kenneth Gray, Appellant.

Calendar Date:October 17, 2024

Before:Garry, P.J., Egan Jr., Aarons, Lynch and Ceresia, JJ.

Hug Law PLLC, Albany (Matthew C. Hug of counsel), for appellant.
Robert M. Carney, District Attorney, Schenectady (Peter H. Willis of counsel), for respondent.

Garry, P.J.
Appeal from a judgment of the County Court of Schenectady County (Tatiana Coffinger, J.), rendered July 18, 2023, convicting defendant upon his plea of guilty of the crime of attempted criminal possession of a weapon in the second degree.
In October 2021, defendant was arrested following a traffic stop and his vehicle was impounded. A purported inventory search of the vehicle revealed a handgun, among other things. Defendant was later charged by indictment with criminal possession of a weapon in the second degree, criminal possession of a weapon in the third degree and aggravated unlicensed operation of a motor vehicle in the second degree. After County Court (Caruso, J.) denied his motion to suppress the handgun, defendant pleaded guilty to a reduced charge of attempted criminal possession of a weapon in the second degree in satisfaction of the indictment. County Court (Coffinger, J.) sentenced him in accordance with the plea agreement, as a second felony offender, to a prison term of four years, to be followed by five years of postrelease supervision. The court also granted defendant's motion to stay the judgment of conviction pending appeal and continued his release on bail (see CPL 460.50). Defendant appeals.
Defendant maintains that the subject traffic stop lacked probable cause and that the impoundment of his vehicle and ensuing search thereof were in contravention of departmental policy and pretextual, all in violation of his state and federal constitutional right to be secure from unreasonable searches and seizures (see US Const 4th Amend; NY Const, art I, § 12). With respect to the impoundment and search, we agree.
As relevant here, an automobile stop is lawful when "based on probable cause that a driver has committed a traffic violation" (People v Robinson, 97 NY2d 341, 350 [2001]; see People v Guthrie, 25 NY3d 130, 133 [2015]). This is true "even if the officer's primary motivation is to conduct another investigation" (People v Blandford, 190 AD3d 1033, 1035 [3d Dept 2021], affd 37 NY3d 1062 [2021], cert denied ___ US ___, 142 S Ct 1382 [2022]; see People v Hinshaw, 35 NY3d 427, 430 [2020]; People v Robinson, 97 NY2d at 349). When a defendant challenges "the sufficiency of the factual predicate for the stop," it is the People's burden "to come forward with evidence sufficient to establish that the stop was lawful" (People v Balkman, 35 NY3d 556, 559 [2020]; accord People v Nektalov, 42 NY3d 363, 367 [2024]).
"When the driver of a vehicle is arrested, the police may impound the car, and conduct an inventory search, where they act pursuant to reasonable police regulations relating to inventory procedures administered in good faith" (People v Walker, 20 NY3d 122, 125 [2012] [internal quotation marks and citation omitted]; see People v Tardi, 28 NY3d 1077, 1078 [2016]). "An inventory search is exactly what its name suggests, a search designed to properly catalogue the contents of the item searched" (People v Johnson, 1 NY3d 252, 256 [2003[*2]]; see People v Douglas, 40 NY3d 385, 388 [2023]). "Three specific objectives are advanced by inventory searches: protecting an owner's property while it is in the custody of the police; insuring police against claims of lost, stolen, or vandalized property; and guarding police and others from dangerous instrumentalities that would otherwise go undetected" (People v Galak, 80 NY2d 715, 718 [1993] [citations omitted]; see People v Espinoza, 174 AD3d 1062, 1063 [3d Dept 2019]). "[A]n inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence," and, unlike a traffic stop, an inventory search will be constitutionally invalid where the search was merely a pretext to search for evidence of a crime (People v Johnson, 1 NY3d at 256, 257 [internal quotation marks and citation omitted]; see People v Mortel, 197 AD3d 196, 214 [2d Dept 2021], lv denied 37 NY3d 1097 [2021]). The People bear the initial burden to demonstrate the validity of an inventory search (see People v Padilla, 21 NY3d 268, 272 [2013], cert denied 571 US 889 [2013]; People v Gomez, 13 NY3d 6, 11 [2009]), including "that the subject vehicle was lawfully impounded at the time of the inventory search" and "that the inventory search was conducted pursuant to standardized local police procedures" (People v Mortel, 197 AD3d at 214; see People v Lee, 29 NY3d 1119, 1120 [2017]; People v Walker, 20 NY3d at 125-126).
At the suppression hearing, the People put forth the testimony of Walter Maggs, one of the two Schenectady Police Department officers who conducted the subject stop and inventory search. Maggs testified that he was familiar with defendant prior to the stop, explaining that defendant had been observed interacting with another individual who had fled several traffic stops in the preceding weeks. Based on that observation, Maggs began to investigate defendant and learned that he had a revoked driver's license. On the day of the stop, Maggs observed the vehicle that defendant was known to drive, a 2011 Audi A4, in the driveway of defendant's residence. Maggs parked and waited for defendant to operate the car; when defendant ultimately drove away, Maggs followed him in his marked vehicle. Defendant took a left turn, and signaled while doing so, but only after coming to a stop at the intersection — and thus not continuously during at least the last 100 feet before turning, as required by Vehicle and Traffic Law § 1163 (b). Maggs continued following defendant thereafter, and he did not begin to effectuate the subject traffic stop until defendant pulled over to park on the side of the road sometime later. Body camera footage reveals that the location of the stop was a residential city street, with many other vehicles parked curbside.
At the outset of the traffic stop, Maggs requested defendant's license and registration but did not inform him of the reason that he was being stopped. Defendant quickly admitted that his license was suspended, and he [*3]was asked to step out of the vehicle and was searched by Maggs' partner for officer safety while Maggs ran defendant's license and confirmed that his license was in fact suspended. After that confirmation, Maggs explained to defendant that his conduct constituted a serious crime but that "this is where we have an amnesty period"; if defendant would "work with" Maggs, Maggs would "work with" him. Maggs then asked defendant if there was anything in the car that he needed to know about, to which defendant replied no. Maggs then asked for defendant's consent to search the vehicle, which defendant refused to provide, stating that the vehicle belonged to his father. Maggs asked defendant what in the car belonged to him, and defendant responded, "my phone and charger." Maggs then arrested defendant for the unlicensed operation and informed him that they had to tow his vehicle. In response, defendant asked if his father could come "pick it up." On the body camera footage, Maggs replied that they were "past that." At the hearing, Maggs testified that he knew defendant's father was the registered owner of the vehicle and that the father lived about three blocks or half a mile away from where the vehicle was parked.
The body camera footage shows that Maggs' partner then immediately began searching the driver's side of the vehicle while Maggs proceeded to search the area around the front passenger seat and glove compartment, with the two commenting on how "nervous" defendant appeared. Maggs can be seen sorting through the contents of the glove compartment while he and his partner discussed that defendant had "two phones," including "one on the dash." There is also a subsequent remark by one of the two officers regarding "another f***ing phone." Although, at the hearing, Maggs could not recall the presence of any cell phone in the vehicle, Maggs admitted that there were other items of property in the vehicle. The footage goes on to reveal that the partner was searching the trunk of the vehicle by the time that Maggs opened a large duffle bag on the right rear passenger seat, which he discovered was filled with a significant quantity of marihuana. After that discovery, Maggs continued searching. He then discovered what appeared to be a handgun in a second bag, at which time he instructed his partner, who had by then already closed the trunk, to stop the search. Maggs testified that he then called for an evidence technician and that the vehicle was subsequently towed to the police station, where it was searched pursuant to a warrant.
The section of the Schenectady Police Department Policy Manual regarding vehicle towing was stipulated into evidence. With respect to arrest scenes, the policy provides that, "[w]henever the owner or operator of a vehicle is arrested, the arresting officer should provide reasonable safekeeping by leaving the vehicle secured and lawfully parked at the scene or, when appropriate, by having the vehicle towed, such as when the vehicle [*4]presents a traffic hazard or the vehicle would be in jeopardy of theft or damage if left at the scene." The policy further provides that, "[o]fficers are not required to investigate whether alternatives to towing a vehicle exist after an arrest"; "[h]owever, a vehicle should not be towed if reasonable alternatives exist." The policy provides a list of examples of situations where a vehicle should not be towed, including, as relevant here, when "[t]he vehicle can be legally parked, left in a reasonably secure and safe location and is not needed as evidence"; "[t]he arrestee or owner of the vehicle requests that it be released to a person who is present, willing and able to legally take control of the vehicle"; and "[t]he vehicle is legally parked and the arrestee or owner requests that it be left at the scene." As for vehicle inventories, the policy provides that "[t]he contents of all vehicles towed at the request of department members shall be inventoried and listed on the Vehicle Tow-Impound Report." The inventory should include all "personal property," including the contents of open or unlocked containers and locked containers where the container may be opened without damaging it. "If contraband is located during an inventory search, the search shall be immediately suspended and a search warrant must be obtained before a continuation of the search."
With respect to his decision to impound the vehicle, Maggs was asked whether he had concern about leaving defendant's vehicle on the street, which Maggs had described earlier on in his testimony as a "nicer newer model Audi." In response, he testified that he "think[s] it's unsafe to leave a vehicle there while the owner or . . . driver of the vehicle is no longer there." He also acknowledged that defendant's vehicle was legally parked. As for the inventory, Maggs admitted that a complete inventory was not taken; once he observed the weapon, "that inventory [was] over with at that point." Maggs did, however, complete a vehicle tow impound report form at some point thereafter, which reflects the contents of the vehicle as only "larg[e] bag with contraband" and "bag with gun/ money."
As for the traffic stop, defendant's statutory interpretation argument regarding the Vehicle and Traffic Law is unpreserved for appellate review (see CPL 470.05 [2]). In any event, "whether or not Vehicle and Traffic Law § 1163 (b) applies to, as relevant here, a vehicle that has come to a complete stop at a stop sign is not the issue to be decided when determining whether the officer had probable cause to stop the vehicle in which defendant was a passenger. Rather, to determine whether the officer had probable cause to stop the vehicle, the issue is whether the officer's belief that defendant violated the Vehicle and Traffic Law was objectively reasonable" (People v Mickens, 214 AD3d 1073, 1074 [3d Dept 2023] [internal quotation marks, ellipsis and citation omitted]). Additionally, although there were inconsistencies between [*5]Maggs' testimony and other evidence, we disagree with defendant that the officer was so incredible that his testimony regarding defendant's failure to properly signal should be disregarded. As Vehicle and Traffic Law § 1163 (b) "can reasonably be read to require that all motorists, regardless of whether they are stopping at a stop sign, activate their turn signal not less than 100 feet prior to making the turn" (People v Mickens, 214 AD3d at 1075 [internal quotation marks and citation omitted]; see generally Moore v City of New York, 197 AD3d 93, 95 [2d Dept 2021]), the subject stop was supported by probable cause.
Turning to the impoundment of the vehicle, we agree that the People failed to establish that the decision to impound defendant's vehicle was made in accordance with standardized departmental policy (see People v Tardi, 28 NY3d at 1078). Initially, to the extent that Maggs testified that the Schenectady Police Department impounds vehicles when the driver is arrested for aggravated unlicensed operation in the second degree, the People failed to reconcile that alleged lack of discretion with the written policy stipulated into evidence, which directs that a secured and lawfully parked vehicle be left at the scene unless it would be inappropriate to do so, such as where the vehicle would be a hazard or in danger of theft or damage. Maggs' ambiguous testimony — essentially asserting that any vehicle parked on the street would be unsafe if unattended — falls short of demonstrating that the subject vehicle was not reasonably secure and safe in this residential area, among the many other vehicles parked curbside (see People v Rivera, 192 AD3d 920, 921 [2d Dept 2021]; People v King, 188 AD3d 721, 722 [2d Dept 2020]; People v Weeks, 182 AD3d 539, 541 [2d Dept 2020]; compare People v Tardi, 28 NY3d at 1078). Further, although departmental policy did not require Maggs to investigate whether defendant's father, who was not present at the scene, was in fact willing and able to take control of the vehicle, "facts were brought to [Maggs'] attention to show that impounding would be unnecessary" (People v Walker, 20 NY3d at 125) — i.e., that the "reasonable alternative[ ]" to towing contemplated by the subject policy existed (compare People v David, 41 NY3d 90, 100-101 [2023]). Moreover, defendant's inquiry as to whether the vehicle could be picked up at some later point is tantamount to a request to leave the vehicle where it was, presenting yet another situation in which a vehicle should not be towed per written departmental policy. Given the People's failure to demonstrate that the vehicle was lawfully impounded at the time of the inventory search, defendant's motion should have been granted.
The People also failed to demonstrate that the so-called inventory search was conducted in compliance with established procedures (see People v Johnson, 1 NY3d at 256). With respect to Maggs' testimony that discovery of the handgun prohibited him from completing [*6]an inventory, we first note that the subject policy required that an inventory search be immediately suspended upon the discovery of any contraband, and Maggs continued to search the vehicle after locating a quantity of marihuana substantial enough to cause him to exclaim with surprise upon its discovery. Maggs himself also described the contents of the duffle bag as "contraband" on the inventory report form. That form also provided a box to check if no inventory was in fact conducted and directs that a reason for the lack of inventory be provided; Maggs did not avail himself of this section. As described above, the policy required that all personal property be inventoried, and Maggs' testimony and the body camera footage demonstrated that other personal property was discovered in the vehicle, notably prior to the handgun being observed. Although "[t]he omission of items from [an] inventory report does not render the inventory search invalid" (People v Kabia, 197 AD3d 788, 790 [3d Dept 2021], lv denied 37 NY3d 1162 [2022]; see People v Walker, 20 NY3d at 127), here, nothing in the vehicle was inventoried apart from the contraband (see People v Gomez, 13 NY3d at 11; People v Jones, 185 AD3d 1159, 1162 [3d Dept 2020]; see also People v Cabrera, 224 AD3d 462, 463 [1st Dept 2024]). Thus, "the hallmark of an inventory search," "a meaningful inventory list," is lacking (People v Johnson, 1 NY3d at 256; see People v Jones, 185 AD3d at 1161-1162; People v Leonard, 119 AD3d 1237, 1239 [3d Dept 2014]; compare People v Gabriel, 155 AD3d 1438, 1441-1442 [3d Dept 2017], lv denied 31 NY3d 1081 [2018]; People v Peters, 49 AD3d 957, 959 [3d Dept 2008], lv denied 10 NY3d 938 [2008]). In addition to failing to create a usable inventory, Maggs also admitted that he did not adhere to other aspects of departmental policy, including directives to ask the occupant(s) of the vehicle whether it contained any valuables or hazardous materials, to record the response(s) to that question on the inventory report, and to provide a copy of said report to the tow truck operator, among others.
There is also considerable indicia that the purported inventory search was a pretext to search for contraband, including the canvassing of defendant's residence, the absence of any traffic citation, and the fact that the decision to arrest defendant and impound the vehicle came only after defendant refused to provide his consent to search the vehicle (see generally People v Mortel, 197 AD3d at 228; People v Espinoza, 174 AD3d at 1064; People v Elpenord, 24 AD3d 465, 466-467 [2d Dept 2005]). Maggs also admitted at the hearing, and before the grand jury, that one of the purposes of his search was to confirm that there was nothing "illegal" in the vehicle. "While incriminating evidence may be a consequence of an inventory search, it should not be its purpose" (People v Johnson, 1 NY3d at 256). "Simply put, the search at bar was not designed to produce an inventory" (People v Gomez, 13 NY3d at [*7]11), and it therefore provided an additional basis to grant defendant's suppression motion.
Aarons, Lynch and Ceresia, JJ., concur.
Egan Jr., J. (dissenting).
Although I agree with the majority that officers properly stopped defendant's vehicle after observing him commit a violation of the Vehicle and Traffic Law and arrested him for aggravated unlicensed operation in the second degree, I do not agree with their further conclusion that the tow and inventory search that ensued departed from established procedure so as to warrant suppression of the handgun found in the vehicle. Thus, I respectfully dissent from the majority's conclusion to the contrary and would affirm the judgment of conviction.
The proof at the suppression hearing included the testimony of one of the officers involved in the traffic stop, video footage from his body camera of the incident, and Schenectady Police Department policies governing vehicle towing and searches. The testimony of the officer — which County Court (Caruso, J.) found to be credible — reflected that he was familiar with defendant and knew that defendant had a suspended driver's license prior to the stop. At approximately 5:50 p.m. on October 4, 2021, he and another officer were on patrol when they spotted a four-door Audi sedan parked in the driveway of defendant's residence. They parked down the street and, a few moments later, followed defendant when he got into the Audi and drove away. The officers then watched as he failed to signal at least 100 feet before turning right at an intersection, in violation of the Vehicle and Traffic Law. They also turned right at the intersection and remained behind defendant and, when he signaled and pulled over to the side of the street, they pulled in behind him, activated their lights and initiated a traffic stop.
The testifying officer thereafter confirmed that defendant's license had been revoked (see Vehicle and Traffic Law § 511 [2] [ii]). Defendant declined to grant the testifying officer consent to search the vehicle. The testifying officer then arrested defendant for aggravated unlicensed operation of a motor vehicle in the second degree. The officer added that he saw people walking around the area during the stop and that, in his opinion, a "nicer newer" vehicle like the Audi would not be safe there with the driver absent. No one else was on the scene to drive the Audi away, and the officer declined defendant's request to contact his father and see if he could come and pick the vehicle up. The testifying officer and his partner accordingly began to conduct an inventory search before the Audi was towed, and the testifying officer discovered a duffel bag containing a large amount of marihuana in the back seat. Immediately underneath the duffel bag was a satchel containing cash and a black handgun. At that point, pursuant to department policy, the inventory search ceased and the Audi was towed to police headquarters so that a search warrant for the vehicle could [*8]be obtained. A warrant was obtained, and no additional contraband was found in the ensuing search.
The majority concludes, and I agree, that County Court was free to determine from this proof that the officers properly approached defendant's stopped vehicle after observing him commit a violation of the Vehicle and Traffic Law, then properly arrested him for aggravated unlicensed operation in the second degree upon confirming that he had a revoked driver's license. "When the driver of a vehicle is arrested, the police may impound the car, and conduct an inventory search, where they act pursuant to reasonable police regulations relating to inventory procedures administered in good faith" (People v Walker, 20 NY3d 122, 125 [2012] [internal quotation marks and citation omitted]; see People v Tardi, 28 NY3d 1077, 1078 [2016]). The applicable regulations here are set forth in Schenectady Police Department Policy 502, which provides that an officer arresting a vehicle's driver "should provide reasonable safekeeping by leaving the vehicle secured and lawfully parked at the scene or, when appropriate, by having the vehicle towed, such as when the vehicle presents a traffic hazard or the vehicle would be in jeopardy of theft or damage if left at the scene." The policy does not attempt to identify every instance in which it would, or would not, be "appropriate" to tow a vehicle rather than leaving it in place. It instead provides guidelines for the officer to make that call and specifies that, although "a vehicle should not be towed if reasonable alternatives exist," the officer was under no obligation "to investigate whether alternatives to towing a vehicle exist" and was only obliged to consider whether "public safety [or] the reasonable safety of the vehicle and its contents" called for towing. The policy further cites a few examples of situations where a vehicle should not be towed, such as where the vehicle is "legally parked, left in a reasonably secure and safe location and is not needed as evidence" or where the arrestee "requests that it be released to a person who is present, willing and able to legally take control of the vehicle." The policy, in short, sets forth standards that officers may consistently apply to assess the facts on the ground and determine whether towing is necessary.
Here, the testifying officer considered the issues of public safety and whether the vehicle and its contents would be reasonably safe, and he testified that he had seen people walking around at the time of the traffic stop and did not believe that the "nicer newer" Audi would be safe if it was left on the scene. The majority views that belief as "ambiguous" and worthy of skepticism, but the officer had firsthand knowledge of the streets of Schenectady and the areas where vehicles would be at risk of damage and theft. County Court determined that the officer's testimony was credible, and that assessment of credibility is entitled to "great weight" and may only be disturbed [*9]where the record shows that it was "clearly erroneous" (People v Graham, ___ AD3d ___, ___, 2024 NY Slip Op 06627, *3 [3d Dept 2024] [internal quotation marks and citation omitted]). The majority fails to point to such proof in the record, and I do not spot any. I would therefore defer to County Court's assessment that the officer honestly perceived risks to "the reasonable safety of the vehicle and its contents" if left on the street and determined that those risks warranted towing under department policy (see People v Tardi 28 NY3d at 1078; compare People v Rivera, 192 AD3d 920, 921 [2d Dept 2021] [testifying officer towed vehicle "because it was used in the commission of a crime" rather than safety concerns]; People v King, 188 AD3d 721, 722-723 [2d Dept 2020] [testifying officer referenced general policy of impounding vehicles for "safekeeping" following arrest]).
Further, while defendant asked if his father could come and get the vehicle, it suffices to say that the policy only cited the situation where another individual was "present, willing and able to legally take control of" the vehicle as one where the vehicle should be left in place following an arrest. Defendant's father was not on the scene, and defendant's speculation that his father might have been nearby and might have been willing to quickly come to the scene to retrieve the Audi did not demonstrate to the testifying officer "that impounding would be unnecessary" (People v Walker, 20 NY3d at 125). Departmental policy was explicit that the testifying officer was not required to investigate whether such an alternative to towing existed and, as we have previously made clear, "[i]t would indeed be an onerous rule that requires the police, in every case where there is a custodial arrest, to inquire whether somebody, somewhere may be available to drive the arrestee's car and to further require that the police then cast about trying to find such person" (People v Schwing, 13 AD3d 725, 726 [3d Dept 2004]; see People v Wilburn, 50 AD3d 1617, 1618 [4th Dept 2008], lv denied 11 NY3d 742 [2008]). I am, in short, satisfied that the officer's decision to tow the Audi complied with departmental policy and was reasonable in all respects.
In my view, even if defendant first came to the testifying officer's attention because the officer suspected that he was involved in illegal conduct, the foregoing evidence reflects that the stop of defendant's vehicle was valid and gave no reason to believe that the "corresponding inventory search was a mere pretext to uncover incriminating evidence; rather, the testimony established that the officer's intention for the search was to inventory the items in the vehicle prior to having it towed" (People v David, 209 AD3d 1276, 1277 [4th Dept 2022] [internal quotation marks, brackets and citations omitted], affd 41 NY3d 90 [2023]). As for how the inventory search was handled, such a search "must be conducted pursuant to 'an established procedure' that is related[*10]'to the governmental interests it is intended to promote' and that provides 'appropriate safeguards against police abuse' " (People v Walker, 20 NY3d at 126, quoting People v Galak, 80 NY2d 715, 716 [1993]). The inventory search is documented via the testifying officer's bodycam footage, and it shows how the search was conducted and how the testifying officer discovered marihuana in a duffel bag on the backseat, then lifted the bag to find a satchel containing cash and a handgun underneath it. Schenectady Police Department policy required the officers to "immediately suspend[ ]" the search in the event of the discovery of contraband and seek a search warrant to complete any examination of the Audi's contents, and the testifying officer and his partner complied with that policy.
The majority faults the officers for, among other things, failing to comply with procedures such as questioning defendant regarding the presence of valuable or hazardous materials in the Audi, preparing an inventory form with a sufficiently complete inventory list and then providing a copy of that form to the tow truck driver. I view nothing unusual, however, in the fact that an inventory form was not completed of the entire car for the simple reason that the inventory search was stopped once the handgun was found, per department policy, and the officer then completed a vehicle tow/impound report for the terminated search. None of this reflects that the officers who conducted the search were impermissibly rummaging through the Audi for evidence of criminality or that they were trying to do anything other than create the "usable inventory" that is the goal of any inventory search; rather, it confirms that they did comply with the policy and halted the inventory search process midway because their department policy specified such (People v Galak, 80 NY2d at 720). It is not our place "to micromanage the procedures used to search properly impounded cars" and require more under these circumstances (People v Walker, 20 NY3d at 127). Thus, as I am satisfied that the decision to tow the Audi and ensuing inventory search substantially complied with departmental policy and "me[t] the constitutional minimum," I agree with County Court that suppression of the handgun found in the vehicle was not needed (id.).
ORDERED that the judgment is reversed, on the law, motion to suppress granted to the extent of suppressing the handgun, plea vacated and matter remitted to the County Court of Schenectady County for further proceedings not inconsistent with this Court's decision.